*In The*

# United States Court of Appeals

## For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee*,

**v.**

## RAUF ABDUL SALAM,
## a/k/a Pierre Demaro Banks, a/k/a Radio,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT ROANOKE**

―――――――――

**BRIEF OF APPELLANT**

―――――――――

Paul G. Beers
GLENN, FELDMANN, DARBY & GOODLATTE
37 Campbell Avenue, S.W.
Post Office Box 2887
Roanoke, Virginia 24001-2887
(540) 224-8000

*Counsel for Appellant*

# **TABLE OF CONTENTS**

Table of Authorities ...................................................................................v

Statement of Subject Matter and Appellate Jurisdiction ..........................................1

Statement of the Issues..............................................................................1

I.    WHETHER THE DISTRICT COURT ERRED BY OVERRULING SALAM'S MOTION TO EXCLUDE TESTIMONY OF GOVERNMENT EXPERT?

II.   WHETHER THE DISTRICT COURT ERRED BY ADMITTING OUT-OF-COURT STATEMENTS UNDER THE CO-CONSPIRATOR EXCEPTION TO THE RULE AGAINST HEARSAY?

III.  WHETHER THE DISTRICT COURT ERRED BY OVERRULING SALAM'S OBJECTIONS TO THE TESTIMONY OF DETECTIVE LOUIS RENSHAW CONCERNING HEROIN DISTRIBUTION IN PATTERSON, NEW JERSEY?

IV.   WHETHER THE DISTRICT COURT ERRED BY REFUSING SALAM'S REQUESTED JURY INSTRUCTION ON MULTIPLE CONSPIRACIES?

V.    WHETHER THE DISTRICT COURT ERRED BY OVERRULING DEFENSE COUNSEL'S OBJECTIONS AND MOTION FOR MISTRIAL DURING THE PROSECUTOR'S IMPROPER REBUTTAL ARGUMENT AND THEREBY DEPRIVED SALAM OF A FAIR TRIAL?

VI.   WHETHER THE DISTRICT COURT ERRED AT SENTENCING  BY IMPOSING A FOUR-LEVEL ENHANCEMENT BECAUSE SALAM PURPORTEDLY WAS AN ORGANIZER OR LEADER OF THE CONSPIRACY?

Statement of the Case and Facts ................................................................2

    Statement of the Case .......................................................................2

    Statement of the Facts.......................................................................4

        A Cavalcade of Miscreants ....................................................4

        The Arrest of Jonathan Seale at the Boones Mill Shell Station on August 30, 2012 ...............................................................5

        The Recorded Cellphone Conversations on the Evening of August 30, 2012 ...................................................................6

        The Arrest of Chris Carter on the Evening of August 30, 2012, Outside Crown Chicken in Roanoke....................................7

        Trina Richardson ....................................................................8

        Antonne Day ...........................................................................9

        Chmar Russell.........................................................................9

        Jessica Brown .........................................................................9

        Linda Thompson....................................................................10

        Michael Payne.......................................................................10

        Detective Louis Renshaw ....................................................11

Summary of the Argument.......................................................................11

Argument

Standard of Review ..................................................................................13

I.     THE DISTRICT COURT ERRED BY OVERRULING SALAM'S MOTION TO EXCLUDE TESTIMONY OF GOVERNMENT EXPERT ................................................................15

II.    THE DISTRICT COURT ERRED BY ADMITTING OUT-OF-COURT STATEMENTS UNDER THE CO-CONSPIRATOR EXCEPTION TO THE RULE AGAINST HEARSAY ...............................21

III.   THE DISTRICT COURT ERRED BY OVERRULING SALAM'S OBJECTIONS TO THE TESTIMONY OF DETECTIVE LOUIS RENSHAW CONCERNING HEROIN DISTRIBUTION IN PATTERSON, NEW JERSEY .................................................25

IV.   THE DISTRICT COURT ERRED BY REFUSING SALAM'S REQUESTED JURY INSTRUCTION ON MULTIPLE CONSPIRACIES .........................................................................27

V.    THE DISTRICT COURT ERRED BY OVERRULING DEFENSE COUNSEL'S OBJECTIONS AND MOTION FOR MISTRIAL DURING THE PROSECUTOR'S IMPROPER REBUTTAL ARGUMENT AND THEREBY DEPRIVED SALAM OF A FAIR TRIAL ..............................................................................28

     A.    The Prosecutor's Rebuttal Argument Was Improper ..........................29

     B.    The Prosecutor's Improper Argument Deprived Salam Of A Fair Trial ................................................................32

          1.    The improper comments were misleading ................................32

          2.    The prosecutor's improper remarks were extensive ................35

          3.    Competent evidence of guilt was not particularly strong .........36

          4.    The prosecutor's improper remarks were a deliberate attempt to divert the jury's attention to extraneous matters ................................................................39

5.     The prosecutor's improper remarks were not invited by improper conduct of defense counsel .......................................40

6.     The trial judge delivered no curative instructions ....................40

VI.   THE DISTRICT COURT ERRED AT SENTENCING BY IMPOSING A FOUR-LEVEL ENHANCEMENT BECAUSE SALAM PURPORTEDLY WAS AN ORGANIZER OR LEADER OF THE CONSPIRACY ..............................................................................41

Conclusion ...........................................................................................................44

Request for Oral Argument.....................................................................................44

Certificate of Compliance with Rule 28.1(e) or 32(a)

Certificate of Service

# TABLE OF AUTHORITIES

Cases

Bates v. Bell,
    402 F.3d 635 (6th Cir. 2005) .......................................................................31

United States v. Barile,
    286 F.3d 749 (4th Cir. 2002) .......................................................................17

United States v. Cameron,
    573 F.3d 179 (4th Cir. 2009) .......................................................................42

United States v. Carter,
    601 F.3d 252 (4th Cir. 2010) .......................................................................15

United States v. Conrad,
    507 F.3d 424 (6th Cir. 2007) .................................................................24, 25

United States v. Garcia,
    752 F.3d 382 (4th Cir. 2014) ...........................................................13, 26, 36

United States v. Graham,
    711 F.3d 445 (4th Cir. 2013) .......................................................................14

United States v. Hager,
    721 F.3d 167 (4th Cir. 2013) .......................................................................26

United States v. Holmes,
    670 F.3d 586 (4th Cir. 2012) .......................................................................17

United States v. Holmes,
    413 F.3d 770 (8th Cir. 2005) .................................................................39, 40

United States v. Hurwitz,
    459 F.3d 463 (4th Cir. 2006) .......................................................................14

United States v. Ibisevic,
       675 F.3d 342 (4th Cir. 2012) .........................................................38

United States v. Johnson,
       617 F.3d 286 (4th Cir. 2010) .........................................................14

United States v. Leonard,
       777 F.Supp.2d 1025 (W.D. Va. 2011).............................................27

United States v. Ollivierre,
       378 F.3d 412 (4th Cir. 2004) ..................................................*passim*

United States v. Pratt,
       239 F.3d 640 (4th Cir. 2001) ...........................................22, 23, 24

United States v. Rodriguez-Lopez,
       756 F.3d 422 (5th Cir. 2014) .........................................................41

United States v. Sayles,
       296 F.3d 219 (4th Cir. 2002) .........................................................42

United States v. Scheetz,
       293 F.3d 175 (4th Cir. 2002) ..................................................32, 41

United States v. Slade,
       631 F.3d 185 (4th Cir. 2011) ...........................................42, 43, 44

United States v. Wilson,
       135 F.3d 291 (4th Cir. 1998) ..................................................40, 41

United States v. Young,
       470 U.S. 1 (1985)..........................................................................31

Constitutional Provisions

U.S. Const. Amend. V.......................................................................28, 41

U.S. Const. Amend. VI ...................................................................*passim*

## Statutes

18 U.S.C.S. § 3231 ................................................................................................1

18 U.S.C.S. § 3742(a) ...........................................................................................1

21 U.S.C.S. § 841 ................................................................................................2

21 U.S.C.S. § 846 ................................................................................................2

21 U.S.C.S. § 851 ................................................................................................2

28 U.S.C.S § 1291 ................................................................................................1

## Rules and Regulations

Rule 16 of the Federal Rules of Criminal Procedure .............................11, 16, 20, 21

Rule 403 of the Federal Rules of Evidence ........................................................12, 25

Rule 801(d)(2)(E) of the Federal Rules of Evidence ..............................12, 14, 22, 24

United States Sentencing Guidelines ................................................................*passim*

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

The United States District Court for the Western District of Virginia had subject matter jurisdiction pursuant to 18 U.S.C.S. § 3231.  On July 21, 2014, Rauf Abdul Salam ("Salam") filed his Notice of Appeal to the United States Court of Appeals for the Fourth Circuit  (J.A. Vol. II, 810-11),[1] which has jurisdiction over Salam's appeal of his convictions and sentences pursuant to 28 U.S.C.S. § 1291 and 18 U.S.C.S. § 3742(a).

## STATEMENT OF THE ISSUES

**I.**  **WHETHER THE DISTRICT COURT ERRED BY OVERRULING SALAM'S MOTION TO EXCLUDE TESTIMONY OF GOVERNMENT EXPERT?**

**II.**  **WHETHER THE DISTRICT COURT ERRED BY ADMITTING OUT-OF-COURT STATEMENTS UNDER THE CO-CONSPIRATOR EXCEPTION TO THE RULE AGAINST HEARSAY?**

**III.**  **WHETHER THE DISTRICT COURT ERRED BY OVERRULING SALAM'S OBJECTIONS TO THE TESTIMONY OF DETECTIVE LOUIS RENSHAW CONCERNING HEROIN DISTRIBUTION IN PATTERSON, NEW JERSEY?**

**IV.**  **WHETHER THE DISTRICT COURT ERRED BY REFUSING SALAM'S REQUESTED JURY INSTRUCTION ON MULTIPLE CONSPIRACIES?**

---

[1] References to the three volume Joint Appendix are indicated by "J.A." plus the relevant volume and page numbers.

1

**V.  WHETHER THE DISTRICT COURT ERRED BY OVERRULING DEFENSE COUNSEL'S OBJECTIONS AND MOTION FOR MISTRIAL DURING THE PROSECUTOR'S IMPROPER REBUTTAL ARGUMENT AND THEREBY DEPRIVED SALAM OF A FAIR TRIAL?**

**VI.  WHETHER THE DISTRICT COURT ERRED AT SENTENCING BY IMPOSING A FOUR-LEVEL ENHANCEMENT BECAUSE SALAM PURPORTEDLY WAS AN ORGANIZER OR LEADER OF THE CONSPIRACY?**

## STATEMENT OF THE CASE AND FACTS

### Statement of the Case

A federal grand jury indicted the defendant on March 21, 2013, for conspiring to distribute 1,000 grams or more of heroin in violation of 21 U.S.C.S. §§ 841(a)(1)-(b)(1)(A) and 846.  (J.A. Vol. I, 14-15).  Because the government subsequently filed the requisite notice of enhanced punishment under 21 U.S.C.S. § 851, Salam faced a mandatory, statutory minimum sentence of 20 years in prison as a result of previous convictions. (J.A. Vol. I, 29).

Prior to trial, Salam's appointed counsel filed three motions in limine  (J.A. Vol. I, 17-25; 76-78; 129-32; 137-38) and a Motion to Exclude Testimony of Government Expert (J.A. Vol. I, 67-69).  These pretrial motions in large part were overruled or taken under advisement.  (J.A. Vol. I, 48-54; 96-107; 139-41).

With Judge Conrad presiding, the jury trial took place April 7-9, 2014, in Roanoke.  When the government rested, Salam moved unsuccessfully for judgment

of acquittal. (J.A. Vol. II, 563-66; 634-35).    The defense elected not to put on evidence. (J.A. Vol. II, 566; 568).

The parties' counsel then presented closing arguments. (J.A. Vol. II, 582-634).  During the prosecutor's rebuttal, defense counsel objected twice that the government's argument was improper and then moved for a mistrial on the same basis. The trial judge overruled Salam's objections and his mistrial motion without delivering any curative instructions. (J.A. Vol. II, 624; 628; 634).

After deliberating three hours and 20 minutes, the jury found Salam guilty of distributing 1,000 grams or more of heroin as charged in the indictment. (J.A. Vol. II, 669; 726).

Salam filed post-trial motions for judgment of acquittal or a new trial. In these post-trial motions, Salam renewed his request for a mistrial on account of the prosecutor's rebuttal argument. (J.A. Vol. II, 727-28). The district court denied Salam's post-trial motions in an Order dated April 28, 2014. (J.A. Vol. II, 729-34).

A federal probation officer issued a Presentence Investigation Report ("PSR") on May 30, 2014. (J.A. Vol. III, 812-41). The probation officer recommended the district court impose a four-level enhancement under Section 3B1.1(a) of the United States Sentencing Guidelines.  This upward adjustment in Salam's offense level reflected the probation officer's view that he was an

organizer or leader of the charged conspiracy. (J.A. Vol. III, 823). Salam responded by objecting to any upward role adjustment to his offense level. (J.A. Vol. II, 741-42; 767; 771-73).

The district court held a sentencing hearing on July 14, 2014. (J.A. Vol. II, 764-803). Overruling Salam's objection, the court adopted the probation officer's recommendation that he receive a four-level enhancement under U.S.S.G. § 3B1.1(a) for playing a managerial role in the conspiracy. (J.A. Vol. II, 775; 786).

Salam's imprisonment range under the Sentencing Guidelines extended from 292 to 365 months, Judge Conrad determined. The court sentenced Salam to the low end of the range, 292 months, followed by five years of supervised release. (J.A. Vol. II, 786; 792). This sentence was memorialized in a final Judgment on July 18, 2014. (J.A. Vol. II, 804-09).

Salam noted a timely appeal. (J.A. Vol. II, 810-11).

## Statement of the Facts

### A Cavalcade of Miscreants

The government relied heavily upon witnesses with extensive criminal histories who testified in hopes of avoiding criminal charges or receiving sentence reductions. Judge Conrad correctly characterized the prosecution's witnesses as a "cavalcade of miscreants." (J.A. Vol. II, 565).

The prosecution was historical rather than forensic in nature. Law enforcement agents seized no drugs from Salam. They found no incriminating evidence in his residence. Prosecutors presented no evidence that Salam sold heroin directly to an undercover agent. The government's case depended upon the accusatory testimony of persons who claimed they used to be Salam's heroin customers. "And, really," Judge Conrad observed at the close of the government's evidence, "it's just a question of credibility as regards to the jury's willingness to accept what's been said from the witness stand." Id.

The Arrest of Jonathan Seale at the
Boones Mill Shell Station on August 30, 2012

Jonathan Seale was a leading member of the government's "cavalcade of miscreants." (J.A. Vol. II, 565; 771). Mr. Seale was a heroin dealer who on a succession of occasions burglarized his parents' home in Rocky Mount, the county seat of rural Franklin County, Virginia. (J.A. Vol. I, 277-78).

An informant working with the Franklin County Sheriff's Department arranged to meet Mr. Seale at the Shell Station in Boones Mill on the evening of August 30, 2012. The purpose of this meeting was to conduct a heroin transaction. When Mr. Seale arrived at the Boones Mill Shell Station with heroin in hand, narcotics detectives detained him and searched his Subaru. (J.A. Vol. I, 222-26). After finding the packaged heroin, agents interviewed Mr. Seale about his

knowledge of other dealers. The officers then drove Mr. Seale to Roanoke, where he was debriefed by Roanoke City Police detectives and the Bureau of Alcohol, Tobacco and Firearms Roanoke Drug Task Force. (J.A. Vol. I, 230-31; 293-94).

Mr. Seale told Detective George Hanger and other Roanoke-based agents that he ordered heroin from Salam by cellphone on a regular basis. But Mr. Seale explained that he had never met Salam. Salam never appeared at the place designated for the drug transaction, Mr. Seale told Detective Hanger and members of the Drug Task Force. Instead, Chris Carter appeared at the appointed hour in a Cadillac Escalade. Mr. Carter handed Mr. Seale heroin in exchange for cash in the course of each transaction. (J.A. Vol. I, 317-19; 329; 332).

Mr. Seale's trial testimony was inconsistent with the information he gave Detective Hanger and the Drug Task Force on the evening of August 30, 2012. At trial, Mr. Seale claimed to have met with Salam and purchased heroin directly from him "two or three times" over a "couple of months." (J.A. Vol. I, 258).

The Recorded Cellphone Conversations
on the Evening of August 30, 2012

Seeking to avoid charges for heroin distribution, Mr. Seale agreed to set up Salam on August 30, 2012. After Detective Hanger affixed a recording device to his cellphone, Mr. Seale that evening dialed a telephone number he claimed belonged to Salam. During two, brief telephone conversations with a male, Mr.

6

Seale ordered heroin. The male seller on the other end of the line told Mr. Seale in code that the heroin could be picked up shortly at Crown Chicken's parking lot in Roanoke. (J.A. Vol. I, 296-99).

<u>The Arrest of Chris Carter on the Evening of August 30, 2012,
Outside Crown Chicken in Roanoke</u>

Drug Task Force officers, led by Case Agent Craig Frye of the ATF, immediately staked out Crown Chicken. Just as Mr. Seale predicted, Chris Carter rolled up in a Cadillac Escalade. Driving the car was Chris Carter's domestic partner, Trina Richardson. After stopping the pair, Drug Task Force agents frisked Mr. Carter while he stood next to Ms. Richardson's Escalade. A few feet from Mr. Carter officers found a brick of heroin. (J.A. Vol. I, 300-03).

The Drug Task Force arrested Mr. Carter, confiscated his cellphone and executed a search warrant at the house he shared with Trina Richardson. Agents found more than 16 bricks of heroin in the residence. (J.A. Vol. I, 304-05). Detective Hanger then entrusted Mr. Carter's cellphone to Drug Task Force Case Agent Frye. (J.A. Vol. I, 322-23; 325).

Mr. Carter never implicated Salam. The government did not call him as a witness at Salam's trial. The government instead called Mr. Seale and the cavalcade of other witnesses whose testimony is summarized below.

<u>Trina Richardson</u>

Two weeks before the Drug Task Force stopped her while she drove Chris Carter in her Cadillac Escalade to meet Jonathan Seale at Crown Chicken on the evening of August 30, 2012, Trina Richardson pled guilty to a federal felony offense in North Carolina. Ms. Richardson received a probationary sentence for her role in a successful scheme to bribe correctional officers at the federal penitentiary in Butner, North Carolina. (J.A. Vol. I, 336-37; 354-59). While Ms. Richardson was involved in this conspiracy to smuggle contraband into the Butner facility, Mr. Carter was serving a sentence in another institution for narcotics distribution. (J.A. Vol. I, 366).

Ms. Richardson testified that Chris Carter and Salam knew one another. "He would get a phone call and said he had to go do something for Radio," Ms. Richardson testified. (J.A. Vol. I, 341). On the evening of August 30, 2012, Ms. Richardson testified, Chris Carter received a call on his cellphone. After hanging up with the caller, Mr. Carter asked Ms. Richardson to drive him to Crown Chicken. "Come give me a ride to Crown's Chicken. I've got to meet somebody for Little Shorty," Ms. Richardson on direct examination quoted Mr. Carter telling her that night. (J.A. Vol. I, 343-44). Ms. Richardson acknowledged on cross-examination, however, that when she testified in front of the grand jury she

never mentioned that Mr. Carter made a comment on August 30, 2012, about needing ". . . to meet somebody for Little Shorty."   (J.A. Vol. I, 368-69).

### Antonne Day

The government called Antonne Day (a/k/a "Squeak").  Mr. Day  testified that he regularly purchased heroin from Salam in 2011 and 2012. Mr. Day, who is currently serving an 188 months sentence, testified that he resold much of the heroin he purchased from Salam.  (J.A. Vol. II, 412-13).  Mr. Day twice wired funds to Malcolm Hayes, a heroin dealer in Patterson, New Jersey.  (J.A. Vol. I, 416).

### Chmar Russell

Chmar Russell, who is serving 151 months for cocaine distribution, testified that although he never bought or sold heroin, he saw Salam selling the drug on three unspecified dates in 2012. (J.A. Vol. II, 445-47).   According to Mr. Russell, Salam invited him to start selling heroin, but he declined.  (J.A. Vol. II, 446-48).

### Jessica Brown

Jessica Brown is a recidivist shoplifter and former heroin distributor who bought the drug from a dealer named Louis Brown. (J.A. Vol. II, 481-83). Ms. Brown told the jury that she accompanied Louis Brown in a car when he drove to purchase more heroin (or "re-up") from Salam on four occasions. (J.A. Vol. II,

472-73). On cross-examination, however, Ms. Brown conceded that in front of the federal grand jury she was asked, "Did you ever see where [Louis Brown] was getting his stuff from?" Ms. Brown responded, "On one instance, I did ride with Mr. Brown to get a re-up." The person who resupplied Mr. Brown on that "one instance" was "Squeak," i.e., Antonne Day. Jessica Brown did not tell the grand jury she had seen Salam resupply Mr. Brown. (J.A. Vol. II, 486-89).

## Linda Thompson

The government called as a witness Linda Thompson, an inmate who has 18 felonies and countless misdemeanors to her credit. (J.A. Vol. II, 502). Asked to admit that in exchange for her testimony she hoped to received leniency on outstanding state charges, Ms. Thompson insisted she became a prosecution witness solely for "good karma in my life." (J.A. Vol. II, 517-18). Ms. Thompson testified she purchased heroin from Salam's sister, Pam Banks. During some of these sales, Ms. Thompson testified, Salam was present. (J.A. Vol. II, 508-10).

## Michael Payne

Michael Payne, who took the stand in shackles, pled guilty to drug and firearms charges earlier this year. Mr. Payne testified he purchased heroin from Salam for a few months in 2012. At some point in 2012, Mr. Payne testified, Salam stopped selling heroin. Mr. Payne then travelled to Patterson, New Jersey

with Pam Banks, Salam's sister. Ms. Banks introduced Mr. Payne to Malcolm Hayes.  Hayes supposedly claimed to be Salam's former supplier. According to Payne, he succeeded Salam as Mr. Hayes' Roanoke heroin buyer. (J.A. Vol. II, 543-48).

Detective Louis Renshaw

The government's final witness was Louis Renshaw, a narcotics detective with the Office of New Jersey Attorney General.  Detective Renshaw described a large-scale heroin conspiracy in Patterson, New Jersey known to law enforcement as "Operation Dismayed."   He and his colleagues kept under surveillance for months Malcolm Hayes, whom Michael Payne identified as Salam's heroin supplied. Detective Renshaw had never found any evidence that Malcolm Hayes or any member of Operation Dismayed supplied Salam. (J.A. Vol. II, 562).

**SUMMARY OF THE ARGUMENT**

In Section I of Appellant's Brief Salam assails the district court's refusal to grant his Motion to Exclude Testimony of Government Expert.  The government's pretrial notice did not satisfy the disclosure requirements of Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure. Therefore, the government should have been precluded from calling Detective Vince Haddox as an expert in the field of narcotics distribution.

Section II of Appellant's Brief centers on Rule 801(d)(2)(E) of the Federal Rules of Evidence, the co-conspirator exception to the rule against hearsay. The district court erred in admitting out-of-court statements by Antonne Day, Pamela Banks and Malcolm Hayes. Because the erroneously admitted statements were not made during the course of the charged conspiracy or in furtherance of that scheme, this hearsay exception was inapplicable.

In Section III, Salam revisits the objections he made below to the testimony of Detective Louis Renshaw concerning heroin distribution in Patterson, New Jersey. This testimony about substantial quantities of heroin distributed in New Jersey should have been excluded as unfairly prejudicial under Rule 403 of the Federal Rules of Evidence.

The subject of Section IV is the district court's refusal to deliver Salam's proposed instruction on multiple conspiracies. This instruction was necessary to ensure jurors did not find Salam guilty of distributing 1,000 grams of heroin based on Detective Renshaw's testimony concerning the enormous quantities of the drug involved in a separate, New Jersey conspiracy.

As discussed in Section V, improper remarks by the prosecutor during his rebuttal argument deprived Salam of a fair trial. These improper remarks were highly prejudicial. The trial court erred by overruling Salam's objections and

mistrial motion with respect to the prosecutor's misconduct on rebuttal. The district court did not issue any curative instructions to mitigate the prejudicial effects of the prosecutor's inappropriate criticism of defense counsel.

Finally, in Section VI Salam asks the Court to vacate his sentence. The district court erroneously labeled him a leader or organizer of the alleged conspiracy and imposed a four-level enhancement under Section 3B1.1(a) of the Guidelines. This offense level adjustment was unwarranted. The probation officer's findings in her PSR, which the district court adopted, demonstrate Salam was not a leader or organizer within the meaning of U.S.S.G. § 3B.1.1(a).

## ARGUMENT

### Standard of Review

I. In Section I of Appellant's Brief, Salam challenges the district court's refusal to grant his Motion to Exclude Testimony of Government Expert. This pretrial ruling by the district court is reviewed on appeal for abuse of discretion. United States v. Garcia, 752 F.3d 382, 390 (4th Cir. 2014) ("We review a district court's decision to qualify an expert witness, as well as the admission of such testimony, for abuse of discretion.").

II. In Section II of the Appellant's Brief, Salam takes issue with the district court's admission of out of court declarations under the co-conspirator

exception to the rule against hearsay.  See Fed. R. Evid. 801(d)(2)(E).  These evidentiary rulings are examined deferentially for abuse of discretion.  United States v. Graham, 711 F.3d 445, 453 (4th Cir. 2013) ("We review a district court's admission of a statement under Rule 801(d)(2)(E) for abuse of discretion.").

III.    The subject of Section III is the defendant's objections to the testimony of Detective Louis Renshaw concerning heroin distribution in Patterson, New Jersey.    The district court's decision to overrule these objections is scrutinized for abuse of discretion and harmless error. United States v. Johnson, 617 F.3d 286, 292 (4th Cir. 2010) ("This Court reviews a district court's evidentiary ruling for abuse of discretion.").   The burden of affirmatively raising and proving the harmless error is upon the government. Id. at 299.

IV.    The question presented in Section IV is whether the district court erroneously refused to deliver Salam's Proposed Instruction No. 2.  A trial court's refusal of jury instructions requested by the defense is reviewed for abuse of discretion. United States v. Hurwitz, 459 F.3d 463, 474 (4th Cir. 2006).

V.    Section V of Appellant's brief concerns the prosecutor's improper closing argument. The district court's adverse rulings on Salam's objections and associated mistrial motion are reviewed for abuse of discretion and sufficient

prejudice to warrant reversal of the defendant's conviction. United States v. Ollivierre, 378 F.3d 412, 420 (4th Cir. 2004).

VI.    Salam asks the Court in Section VI to vacate his sentence of 292 months on the ground that the trial court misapplied U.S.S.G. § 3B1.1(a) by imposing a four-level enhancement for his role in the charged conspiracy. Factual findings made by the sentencing court in imposing this enhancement are reviewed deferentially for clear error. United States v. Carter, 601 F.3d 252, 254 (4th Cir. 2010) ("When evaluating a challenge to a sentence enhancement, we review the district court's factual findings only for clear error, and if the issue turns primarily on the legal interpretation of the guidelines, our review is de novo.") [internal quotation omitted].

# I.    THE DISTRICT COURT ERRED BY OVERRULING SALAM'S MOTION TO EXCLUDE TESTIMONY OF GOVERNMENT EXPERT.

The Government's Amended Notice of Intent to Use Expert Witnesses identified Detective Vince Haddox of the Roanoke City Police Department as an expert in the field of heroin distribution (the "Expert Notice").   (J.A. Vol. I, 55-58).   Salam took issue with the Expert Notice. (J.A. Vol. I, 67-69).   At a pretrial hearing (J.A. Vol. I, 79-117), the district court considered Salam's argument that

the Expert Notice failed to comply with the disclosure requirements of Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure. During this pretrial hearing, the government clarified that Detective Haddox would testify exclusively as an expert rather than as a fact witness.

> The Court: Okay. Let me ask you this: Is Vince Haddox a fact witness in this case?
>
> [Prosecutor]: He is not, Your Honor.

(J.A. Vol. I, 93-94).

Ruling from the bench, the district court declared the notice sufficient. In the district court's view, defense counsel knew the content of Detective Haddox's expert testimony because law enforcement experts are "commonplace" in drug trials. (J.A. Vol. I, 95-96).

This was error. The Expert Notice failed to comply with Rule 16(a)(1)(G), which requires the government to provide a defendant with ". . . a written summary of any testimony that the government intends to . . ." elicit from an expert. "The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, . . . ." FED. R. CRIM. PROC. 16(a)(1)(G).

The Expert Notice specified neither the opinions Detective Haddox was expected to offer at trial nor "the bases and reasons for those opinions." Id. The Expert Notice enumerated 12 topics or subjects Detective Haddox was expected to

cover while on the stand. But the Expert Notice did not specify what the detective would say under oath about most of those topics or subjects. See United States v. Holmes, 670 F.3d 586, 599 (4th Cir. 2012) (affirming trial court's exclusion of expert testimony because proponent's Rule 16 notice failed to specify bases and reasons for expert's opinions); United States v. Barile, 286 F.3d 749, 758 (4th Cir. 2002) (affirming trial court's exclusion of expert testimony because proponent's Rule 16 notice "did not describe [witness's] opinions beyond stating the conclusion he had reached and did not give the reasons for those opinions as required. . . .").

Three examples drawn from Detective Haddox's trial testimony underscore the insufficiency of the government's pretrial disclosure. The Expert Notice stated Detective Haddox would testify or opine about " . . . (1) The flow of heroin from source city to destination city and common source cities; . . . ." (J.A. Vol. I, 57). This vague disclosure concerning the flow of heroin from "common source cities" failed to specify which "common source cities" here or abroad the expert would identify during his testimony. Compare the government's complete lack of specificity on this point in its Expert Disclosure with Detective Haddox's direct examination.

Q.                          Is there heroin in Roanoke?

Det. Haddox.        Yes, sir.

| Q. | And where does heroin tend to come from that you have seen? |
|---|---|
| Det. Haddox. | From larger source cities, New York; Patterson, New Jersey.[2] |

(J.A. Vol. II, 386).

Detective Haddox's expert opinion that heroin found in Roanoke comes from New York or Patterson, New Jersey should have been disclosed in the Expert Notice. The government's theory was that Salam purchased his heroin from Malcolm Hayes in Patterson, New Jersey. The government called several witnesses, including a New Jersey narcotics detective, to link Salam to "a heroin distribution network in Patterson, New Jersey." (J.A. Vol. II, 558; see Vol. II, 415-17; 539-550). The government's overriding if not sole purpose for calling Detective Louis Renshaw of the New Jersey's Office of the Attorney General was to connect Salam to Malcolm Hayes and other major heroin distributors in Patterson. (J.A. Vol. II, 557-62). The government should have disclosed in the Expert Notice that it would elicit expert testimony from Detective Haddox that Patterson is one of two "common source cities" for Roanoke heroin.

---

[2] Patterson, New Jersey and New York City are about 21 miles apart.

Topic (10) in the Expert Notice also was inadequate. This section of the Expert Notice disclosed Detective Haddox would "testify or opine" about the following:

> . . . (10) How drug dealers often speak in code when they are discussing illegal drugs, such as heroin, and/or drug deals on the telephone, particularly if they think they are being recorded, and what some of these codes might be; . . .

(J.A. Vol. I, 58).

On direct examination, Detective Haddox indeed addressed drug dealers' use of "code" when they speak by telephone. But instead of confining Detective Haddox to the generalized terms of the Expert Notice, prosecutors specifically elicited his expert opinion about the term "work."

> Q. When someone talks about "work," they use the term "I had some work," what have you found that to mean?
>
> Det. Haddox. Narcotics.

(J.A. Vol. II, 395).

This expert opinion should have been disclosed in the Expert Notice. The meaning of "work" became important during the government's direct examination of Michael Payne. Prosecutors elicited testimony from Mr. Payne that Salam regularly used the term "work" as a code word for narcotics.

19

| Q. | Did he [Salam] refer to it in any specific way, like "work"? Did he call it "work"? |
| [Payne]. | Yes. |
| Q. | Did he use that word? |
| [Payne]. | Yes. |
| Q. | Did you know "work" to mean anything in particular? |
| [Payne]. | Yeah, it means drugs. |

(J.A. Vol. II, 526).

Detective Haddox's expert opinion that persons involved in trafficking use the term "work" as code for drugs lent credence to Mr. Payne's testimony about Salam's references to "work." Topic (10) in the Expert Notice was inconsistent with Rule 16 disclosure requirements because it failed to notify the defense that Detective Haddox would testify about the meaning of "work."

Topic (12) in the Expert Notice, quoted below, was even vaguer than Topic (10).

> (12)   The use of standard drug trafficking tools, including scales, firearms, and packaging materials.

(J.A. Vol. I, 58).

Topic (12) provided no specificity about Detective Haddox's opinions concerning firearms as "tools of the trade." Nothing in Topic (12) put the defense

on notice that this expert would testify drug dealers in Northern states such as New Jersey accept firearms as payment for heroin.     But Detective Haddox implied as much during his trial testimony.     (J.A. Vol. II, 393-94).     Again, Detective Haddox's testimony echoed that of Michael Payne, who claimed Malcolm Hayes in Patterson, New Jersey accepted a firearm as payment for heroin.  (J.A. Vol. II, 548).[3]

In sum, the district court erred in overruling Salam's Motion to Exclude Testimony of Government Expert. The Expert Notice fell short of Rule 16 disclosure requirements.

## II. THE DISTRICT COURT ERRED BY ADMITTING OUT-OF-COURT STATEMENTS UNDER THE CO-CONSPIRATOR EXCEPTION TO THE RULE AGAINST HEARSAY.

Over Salam's objections, the district court allowed government witnesses to testify about out-of-court statements by others.     Three such out-of-court declarations, all of which were highly prejudicial to Salam, are summarized below.

- Chmar Russell testified that Antonne Day (a/k/a "Squeak") told him Salam was Day's source of heroin (J.A. Vol. II, 448-49).

---

[3] At trial, the government repeatedly attempted to elicit  testimony over defense objections that Salam was interested in acquiring black market firearms for resale. (J.A. Vol. I, 258-59; Vol. II, 416-17).

- Michael Payne testified Pam Banks informed him that Malcolm Hayes in New Jersey was Salam's source of heroin. (J.A. Vol. II, 543-45).

- Michael Payne testified about a series of conversations he had with Malcolm Hayes concerning Hayes' decision to stop selling heroin to Salam because Salam owed Hayes $60,000 or $80,000 for past deliveries. (J.A. Vol. II, 545-48).

None of the out-of-court statements identified above fell within the co-conspirator exception to the rule against hearsay. Rule 801(d)(2)(E) of the Federal Rules of Evidence, which contains this hearsay exception, provides in relevant part:

> (d) Statements That Are Not Hearsay. A statement that meets the following conditions is not hearsay:
>
> . . . (2) An Opposing Party's Statement. The statement is offered against an opposing party and:
>
> > . . . (E) was made by the party's coconspirator during and in furtherance of the conspiracy. . . .

FED. R. EVID. 801(d)(2)(E).

To admit a statement under Rule 801(d)(2)(E), the moving party must satisfy a three-part test:

> . . . In order to admit a statement under 801(d)(2)(E), the moving party must show that (i) a conspiracy did, in fact, exist, (ii) the declarant and the defendant were members of the conspiracy, and (iii) the statement was made in the course of, and in furtherance, of the conspiracy. Idle conversation that touches on, but does not further, the purposes of the

> conspiracy does not constitute a statement in furtherance of a conspiracy under Rule 801(d)(2)(E).

United States v. Pratt, 239 F.3d 640, 643 (4th Cir. 2001) [internal citations omitted].

Antonne Day's out-of-court statement to Chmar Russell that Salam was his heroin supplier did not meet this test for admission. Chmar Russell was not a co-conspirator. He was a bystander who never sold heroin. (J.A. Vol. II, 446-47). Day's purported statement to Russell about Salam therefore was not in "furtherance" of the conspiracy. Any argument by the government that when Day made this statement he was attempting to induce Russell to join the conspiracy would be misplaced. Russell testified that Day, whom he had known since they were school children, never tried to talk him into the alleged heroin distribution network.

> Q.    Did Squeak ever try to get you in?

> A.    No. Squeak know what I do.

(J.A. Vol. II, 448).

Because Day's comment to his friend Russell about Salam was idle chatter which did nothing to further the conspiracy, the court erred by overruling the defense's hearsay objection.

The district court similarly erred when it allowed Michael Payne to testify over Salam's objection about statements made by Pam Banks and Malcolm Hayes. Neither Pam Banks nor Malcolm Hayes testified.

According to Payne, Banks introduced him to Hayes as Salam's former heroin supplier. (J.A. Vol. II, 543-45). Hayes supposedly told Payne that he stopped supplying Salam because the defendant owed him $60,000-$80,000 in heroin debts. (J.A. Vol. II, 545-48). Assuming these declarations were made by Pam Banks and Malcolm Hayes, the statements post-dated Salam's membership in the purported conspiracy. According to Payne, he succeeded Salam as Hayes' Roanoke customer.

Because Salam no longer was a member of the charged conspiracy, these statements by Banks and Hayes about past events did not come within the co-conspirator exception of Rule 801(d)(2)(E). Particularly since the district court made no findings with respect to when Banks and Hayes uttered the statements, they were inadmissible. The government failed to prove the statements were made during the course of the charged conspiracy or in furtherance of that scheme. _Pratt_, 239 F.3d at 643 (government must prove defendant was member of conspiracy when statements made as precondition to admission under Rule 801(d)(2)(E)); United States v. Conrad, 507 F.3d 424, 430 (6th Cir. 2007)

(vacating defendant's convictions because trial court admitted hearsay statements about past events without determining when statements were made).

In sum, Salam's conviction should be reversed because the trial court erroneously admitted the deeply prejudicial hearsay described above.

## III. THE DISTRICT COURT ERRED BY OVERRULING SALAM'S OBJECTIONS TO THE TESTIMONY OF DETECTIVE LOUIS RENSHAW CONCERNING HEROIN DISTRIBUTION IN PATTERSON, NEW JERSEY.

Salam repeatedly objected to the testimony of Detective Louis Renshaw about a separate conspiracy in New Jersey authorities called "Operation Dismayed." (J.A. Vol. I, 76-77; 98-107; Vol. II, 559). Detective Renshaw's testimony about a separate conspiracy to distribute heroin in New Jersey should have been excluded as unfairly prejudicial to Salam. FED. R. EVID. 403.

Testimony about "Operation Dismayed" lacked probative value. Salam was indicted for conspiring to distribute 1,000 grams or more of heroin in the Western District of Virginia. (J.A. Vol. I, 14-15). He was not charged with distributing heroin in New Jersey.

Particularly prejudicial was Detective Renshaw's testimony concerning the quantity of heroin New Jersey authorities seized from Malcolm Hayes, Segunda

Garcia and other leaders of Operation Dismayed. Detective Renshaw described agents seizing 425 bricks of heroin from Malcolm Hayes in October 2012 and "2 kilos of raw heroin" from Segunda Garcia in November of that year. (J.A. Vol. II, 558-62). In support of the government's allegation that Salam distributed at least 1,000 grams of heroin, prosecutors urged jurors during closing arguments to hold him responsible for these drug seizures by Detective Renshaw and his colleagues. (J.A. Vol. II, 589-90; 594; 630).

Because of the significant risk that jurors would count these enormous quantities against Salam when they considered whether he was guilty of conspiring to distribute 1,000 grams of heroin in the Western District of Virginia, the trial court abused its discretion in overruling Salam's objections to Detective Renshaw's testimony. The trial court's admission of this harmful testimony, considered alone or in combination with the other errors analyzed in Appellant's Brief, requires reversal. See United States v. Garcia, 752 F.3d 382, 397 (4th Cir. 2014) (refusing to find harmless trial court's erroneous admission of testimony of law enforcement officer); United States v. Hager, 721 F.3d 167, 203 (4th Cir. 2013) ("Pursuant to the cumulative error doctrine, the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error.").

# IV. THE DISTRICT COURT ERRED BY REFUSING SALAM'S REQUESTED JURY INSTRUCTION ON MULTIPLE CONSPIRACIES.

Salam's Proposed Instruction No. 2 distinguished between single and multiple conspiracies. (J.A. Vol. I, 120). See United States v. Leonard, 777 F.Supp.2d 1025, 1031 and note 4 (W.D. Va. 2011). The district court should have delivered this instruction.

The government introduced evidence about a separate conspiracy in New Jersey ("Operation Dismayed"), as discussed supra. Salam's multiple conspiracy instruction informed jurors that they could only find Salam guilty of distributing at least 1,000 grams of heroin if they determined he did so as part of the single conspiracy charged in the indictment. Jurors did not receive that instruction. They therefore may have improperly held Salam responsible for the substantial quantities of heroin Detective Renshaw and his colleagues recovered from members of Operation Dismayed in New Jersey. The district court's refusal of Salam's Proposed Instruction No. 2 was an abuse of discretion.

**V. THE DISTRICT COURT ERRED BY OVERRULING DEFENSE COUNSEL'S OBJECTIONS AND MOTION FOR MISTRIAL DURING THE PROSECUTOR'S IMPROPER REBUTTAL ARGUMENT AND THEREBY DEPRIVED SALAM OF A FAIR TRIAL.**

Salam was deprived of his Fifth and Sixth Amendment rights to a fair trial by the prosecutor's improper arguments on rebuttal. Salam objected during the rebuttal (J.A. Vol. II, 624; 628) and moved for a mistrial on the grounds of improper prosecutorial remarks. (J.A. Vol. II, 634). The district court overruled defense counsel's objections. The court also denied Salam's mistrial motion, which he renewed in the form of a motion for a new trial following the verdict. (J.A. Vol. II, 634; 727-34).

Whether a prosecutor's closing argument warrants reversal of a defendant's conviction turns on a two-part test.

> In assessing whether a prosecutor's argument warrants reversal, we apply a two-part test, i.e., (1) whether the argument was improper, and if so, (2) whether it so prejudicially impacted the defendant's substantial rights as to deprive him of a fair trial.

United States v. Ollivierre, 378 F.3d 412, 420 (4th Cir. 2004).

A. The Prosecutor's Rebuttal Argument Was Improper.

A prosecutor's closing argument is improper when it ridicules, disparages or impugns defense counsel directly or by implication.

> . . . [A] defendant possesses a due process right to present his case to the jury, and a prosecutor's disparaging comments about defense counsel may impermissibly strike at this fundamental right.

*Ollivierre*, 378 F.3d at 420.

In *Ollivierre*, at <u>id.</u>, the United States Court of Appeals for the Fourth Circuit found the following comments by a federal prosecutor about his opponent plainly improper, despite the lack of any contemporaneous objection at trial:

> - One of the things that I have come to, really had to get used to is sitting and listening to defense attorneys make arguments that are what I consider to be so incredible in light of the facts or the evidence presented in the case. This case is no exception. Another thing that I had to get used to is looking at defense attorneys and seeing how they can make arguments with a straight face in spite of the tremendous amount of evidence and to make statements like they do, like the government didn't come close to proving their case.

> - I don't want to insult your intelligence by again recapping absolutely everything, but he says that the government has no proof other than the flight information. Once again, that is just incredible that he can say that with a straight face, incredible. (along with the preceding comment, the "Straight Face Comments").

*Ollivierre*, 378 F.3d at 416-17.

The prosecutor's attacks upon defense counsel in the case at bar were more disparaging and widespread than the two "straight face comments" found improper

on plain error review in *Ollivierre*, at <u>id.</u> Indeed, the prosecutor devoted much of his rebuttal to impugning Salam's counsel.

At the outset of his rebuttal, the government's counsel accused Salam's lawyer of resorting to "the basic defense attorney technique, you know, always attack what's not there when you can't talk about the things that are there." (J.A. Vol. II, 623). The theme of the prosecutor's improper rebuttal was that Salam's lawyer sought to divert jurors from the law and the evidence with obstructive objections and deceptive arguments. Listed below are examples of the prosecutor's improper attacks.

> Prosecutor. He seems to have a problem with the instructions the Court is going to give you. . . .

(J.A. Vol. II, 623).

> Prosecutor. Why would he want you not to consider the testimony that the eyewitnesses gave? Could it be that he has no explanation why all their testimony fits together so nicely?

(J.A. Vol. II, 623-24).

> Prosecutor. Well did y'all watch the same trial I watched? How many times did Mr. Beers jump up and say "Hearsay, confrontation"? If the case agent had been put on to testify about what somebody else said, Mr. Beers would have had apoplexy, jumping up yelling about hearsay and confrontation. I know it, you know it. So it's kind of funny for him now to say, "Well, they should have done that thing that I would have objected to all day long."

30

(J.A. Vol. II, 628).

The prosecutor's argument on rebuttal was improper. Especially egregious was the prosecutor's intemperate criticism of defense counsel for asserting Salam's constitutional and rule-based rights to confront and cross examine adverse witnesses. (J.A. Vol. II, 628). Any comment upon a defense lawyer's objections to the government's evidence is "clearly improper." <u>Bates v. Bell</u>, 402 F.3d 635, 647 (6th Cir. 2005). By expressing his personal opinion that defense counsel would object on hearsay and Confrontation Clause grounds – "I know it. You know it." – the prosecutor violated cardinal principles of advocacy. "[T]he prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." <u>United States v. Young</u>, 470 U.S. 1, 18-19 (1985).

Equally improper was the prosecutor's declaration, "He [defense counsel] seems to have a problem with the instructions the Court is going to give you." (J.A. Vol. II, 623). These comments and others amounted to an unvarnished effort to besmirch defense counsel's integrity in the jury's eyes. Like the "Straight Face Comments" held improper in *Ollivierre*, 378 F.3d at 421, the rebuttal here was an exercise in prosecutorial misconduct under the first part of the two-part Fourth Circuit test.

### B. The Prosecutor's Improper Argument Deprived Salam Of A Fair Trial.

The prosecutor's improper rebuttal argument was sufficiently serious to meet the prejudice prong of the controlling, two-part test. Relevant factors with respect to the prejudice prong include:

> (1) the degree to which the prosecutor's remarks had a tendency to mislead the jury and to prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the defendant; (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel; and (6) whether curative instructions were given to the jury.

United States v. Scheetz, 293 F.3d 175, 186 (4th Cir. 2002).

Applied here, these factors demonstrate the prosecutor's improper argument deprived Salam of a fair trial.

### 1. The improper comments were misleading.

The comments quoted above misled jurors. For instance, the prosecutor's statement, "He seems to have a problem with the instructions the Court is going to give you," (J.A. Vol. II, 623), was as misleading as it was prejudicial. The prosecutor in this improper line of argument suggested defense counsel contemptuously sought to nullify Judge Conrad's instructions on the law.

Even more misleading was the prosecutor's response to defense counsel's comments concerning the ATF case agent's failure to testify about call history data

contained in the cellphones of Jonathan Seale and Chris Carter. Cellphone communications between (A) Mr. Seale and Salam and (B) Salam and Mr. Carter were critical to the government's theory of the case. The government, however, inexplicably produced no communications data or records of any kind to link these callers.

According to the government, Mr. Seale used his cellphone on the evening of August 30, 2012, to call Salam and place an order for heroin, just as he claimed to have done regularly before that date. The male who answered the phone directed Mr. Seale to consummate the sale at Crown Chicken. The government's theory was that Salam hung up with Mr. Seale and called a co-conspirator, Chris Carter, on Mr. Carter's cellphone. Mr. Carter then drove the heroin to Crown Chicken, where agents arrested him. (J.A. Vol. II, 583-86; 625-27).

The defense's theory of the case was that Mr. Seale's sole supplier was Chris Carter rather than Salam. In the defense's view, Mr. Seale used his cellphone to call Mr. Carter on the evening of August 30, 2012, but misinformed the Drug Task Force that he dialed Salam's cellphone number. (J.A. Vol. II, 605-09). In closing arguments, defense counsel pointed out that the ATF Drug Task Force case agent who seized the cellphones of both Chris Carter and Jonathan Seale on August 30, 2012, failed to testify at trial. Neither the case agent nor any other

officer explained whether those phones substantiated Mr. Seale's claim that he called Salam that evening, as the government maintained, or on any prior occasion. The Drug Task Force case agent also did not explain whether Chris Carter's cellphone was analyzed by the ATF or whether it contained evidence that Mr. Carter receive a call from Salam (or Mr. Seale) that evening. Defense counsel during his closing argument properly commented upon Case Agent Craig Frye's failure to testify about the results of any efforts by the ATF to uncover evidence of calls between Mr. Seale and Salam or calls between Mr. Carter and Salam. (J.A. Vol. II, 603-09).

On rebuttal, the prosecutor vouched he knew that if the government had called the ATF case agent to the stand defense counsel in a fit of apoplexy would have blocked his testimony by raising hearsay and Confrontation Clause objections. (J.A. Vol. II, 628). This representation to jurors was highly improper. Neither the rule against hearsay nor the Confrontation Clause of the Sixth Amendment had anything to do with the case agent's failure to testify about call history data on the cellphones used by Chris Carter and Jonathan Seale  or on account records related to those cellphones.

The prosecutor misled jurors by claiming that if the case agent had taken the stand to testify about this material question of fact (whom did Mr. Seale call on

August 30, 2012, to order heroin – Chris Carter or Salam?), defense counsel would have objected on hearsay and Confrontation Clause grounds. (J.A. Vol. II, 628). Moreover, the prosecutor's assertion was false. Defense counsel did not object whenever a detective attempted to testify about out-of-court statements Mr. Seale or others made to law enforcement agents. Detective Hanger testified extensively without any objection by defense counsel about statements Jonathan Seale, Trina Richardson and others made to law enforcement agents. (J.A. Vol. I, 304; 317-19; 325; 328; 331-35).

2. <u>The prosecutor's improper remarks were extensive</u>.

Whether the prosecutor's disparaging remarks about defense counsel were extensive is a second consideration under the prejudice prong. *Ollivierre*, 378 F.3d at 421. The prosecutor's denigrating remarks were extensive here. The central focus of the prosecutor's rebuttal was on defense counsel. Throughout his rebuttal, the prosecutor sounded the same theme: Salam's lawyer resorts to the common "defense attorney technique" of encouraging jurors to disregard the witness' testimony and the judge's instructions. (J.A. Vol. II, 623). According to the prosecutor, defense counsel "seems to have a problem with the instructions" and tries to obstruct the truth seeking process by repeatedly raising frivolous hearsay and Confrontation Clause objections. (J.A. Vol. II, 623; 628). These

remarks were not isolated or peripheral. They were skillfully embedded in the prosecutor's theme on rebuttal.

3.    Competent evidence of guilt was not particularly strong.

In *Ollivierre*, 378 F.3d at 412, the Court held the prosecutor's "Straight Faced Comments" did not warrant reversal because competent "evidence of Ollivierre's guilt was compelling – indeed, it was nearly overwhelming . . . ." Id. at 422.  In contrast, competent evidence of Salam's guilt was not compelling or overwhelming.  Particularly since law enforcement agents neither observed Salam exchange drugs for money nor found any incriminating evidence in his residence, the prosecutor's improper remarks cannot be disregarded as somehow harmless or nonprejudicial.  See United States v. Garcia, 752 F.3d 382, 398 (4th Cir. 2014) (refusing to find erroneous admission of evidence harmless in drug prosecution because government presented "little direct evidence" and "law enforcement never observed Garcia actually exchanging drugs or money with any coconspirators."). The government's case rested entirely on the testimony of a "cavalcade of miscreants," Judge Conrad aptly observed.  (J.A. Vol. II, 565).  "And, really," the judge continued, "it's just a question of credibility as regards the jury's willingness to accept what's been said from the witness stand." Id.

The credibility of the government's most important miscreant-witness, Jonathan Seale, was very much in question. (J.A. Vol. II, 771). After making an in-court identification of the defendant, Mr. Seale testified that he regularly met with Salam in Roanoke to purchase heroin. (J.A. Vol. I, 254-57). But on the night he was arrested at the Boones Mill Shell Station (August 30, 2012), Mr. Seale told Detective Hanger that he had never met Salam. Mr. Seale often called Salam to place a heroin order. But Salam never appeared at the prearranged delivery site. Mr. Seale told Detective Hanger that Salam invariably dispatched Carter to meet with Mr. Seale and conduct the heroin transactions. (J.A. Vol. I, 318-19). This stark discrepancy between Mr. Seale's testimony at trial and the story he told the Drug Task Force on August 30, 2012, presumably prompted the trial judge to ask Detective Hanger the following question:

| | |
|---|---|
| The Court. | Let me -- did I understand you to say that it was your intelligence that Mr. Seale and Mr. Radio never had any direct contact that Carter was always the intermediary? |
| [Detective Hanger]. | That's what I understood, yes, sir. |

(J.A. Vol. I, 332).

As Salam's counsel emphasized in his closing argument, Mr. Seale's statement to Detective Hanger that he met only with Chris Carter - never with Salam - was fundamentally inconsistent with Mr. Seale's trial testimony. (J.A. Vol. II, 606-08).

Perhaps because they had concerns about the credibility of Mr. Seale and other prosecution witnesses, jurors did not find the evidence of guilt overwhelming.  The jury found this single-count case close.  Jurors deliberated for three hours and twenty minutes before reaching a verdict.

Whether the particular jury which heard the evidence at trial found the case close is the most important consideration in any harmless error or unfair prejudice analysis. United States v. Ibisevic, 675 F.3d 342, 350 (4th Cir. 2012).   The length of deliberations, standing along, may indicate the jury found the case close.   In *Ibisevic*, 675 F.3d at 342, for instance, the jury deliberated four hours before finding the defendant guilty. During those deliberations the jury requested additional information from the trial judge. Id. at 348. Those circumstances strongly suggested jurors who heard the evidence found the case close. Id. at 354. The *Ibisevic* Court therefore held it could not excuse as harmless the trial court's erroneous admission of unfairly prejudicial evidence. Id.

Here, the jury deliberated for three hours and twenty minutes before finding Salam guilty of the one count with which he was charged.  (J.A. Vol. II, 662; 669). In the course of those deliberations, the jury twice asked the trial judge for additional information. (J.A. Vol. II, 662-666). In no sense, then, can the

government's evidence against Salam be fairly characterized as "nearly overwhelming." *Ollivierre*, 378 F.3d at 422.

        4.      The prosecutor's improper remarks were a deliberate attempt to divert the jury's attention to extraneous matters.

The prosecutor's improper comments were unquestionably deliberate. The prosecutor's motive was to divert the jury's attention from the government's lack of forensic evidence. For example, the prosecutor intentionally diverted the jury's attention away from the case agent's failure to explain whether the cellphones of Chris Carter or Jonathan Seale supported the government's theory that (A) Seale called Salam on the evening of August 30, 2012, and (B) Salam shortly thereafter on the same evening called Mr. Carter. The prosecutor's misleading tactic was to vouch to jurors that had the government called the case agent, defense counsel ". . . would have had apoplexy, jumping up yelling about hearsay and confrontation. I know it, you know it." (J.A. Vol. I, 628).

The prosecutor's diversionary tactics were highly prejudicial because he employed them on rebuttal, knowing Salam could not respond.

> It is particularly disturbing that the comments were made during the rebuttal phase of closing argument. . . . Defense counsel was left with no opportunity to rebut the allegations and the jury heard the remark immediately before deliberations. The potential for prejudice is great

during closing arguments, especially when the defense has no opportunity for rebuttal.

United States v. Holmes, 413 F.3d 770, 776 (8th Cir. 2005).

5.     <u>The prosecutor's improper remarks were not invited by improper conduct of defense counsel.</u>

Defense counsel did not engage in improper conduct. Defense counsel told jurors that the trial judge would instruct on the law and ". . . and you're going to apply the Judge's instructions." (J.A. Vol. II, 597). Thus the prosecutor's remark that defense counsel ". . . seems to have a problem with the instructions the Court is going to give you" (J.A. Vol. II, 623) was not invited by any improper conduct on the part of Salam's lawyer. By raising hearsay and Confrontation Clause objections during the trial, defense counsel did not engage in improper conduct which could have invited the prosecutor's ridicule on that score. (J.A. Vol. I, 628).

6.     <u>The trial judge delivered no curative instructions.</u>

Salam's only recourse was to object to the prosecutor's improper rebuttal. The district court's refusal to sustain those objections and issue immediate, curative instructions only exacerbated the unfair prejudice to Salam.

Curative instructions which are prompt and specific can mitigate the prejudicial effects of a prosecutor's improper closing argument. General instructions following the conclusion of closing arguments are insufficient, especially when the trial court overrules a defense objection. <u>Compare</u>, <u>United</u>

States v. Wilson, 135 F.3d 291, 302 (4th Cir. 1998) (holding general instructions insufficient when trial court overruled defense counsel's objection during prosecutor's improper argument) with United States v. Scheetz, 293 F.3d 175, 186 (4th Cir. 2002) (holding prejudice to defendant "was most assuredly cured by the district court's immediate curative instruction") and United States v. Rodriguez-Lopez, 756 F.3d 422, 434 (5th Cir. 2014) (finding prosecutor's improper remarks did not warrant reversal because "the district court was quick to admonish the misconduct, not only immediately sustaining defense counsel's objection but also verbally instructing the jury as to why the remarks were improper.").

In sum, Salam's conviction should be reversed. The prosecutor's improper rebuttal argument deprived him of his Fifth and Sixth Amendment rights to a fair trial.

## VI. THE DISTRICT COURT ERRED AT SENTENCING BY IMPOSING A FOUR-LEVEL ENHANCEMENT BECAUSE SALAM PURPORTEDLY WAS AN ORGANIZER OR LEADER OF THE CONSPIRACY.

On May 30, 2014, the probation officer issued her PSR. (J.A. Vol. III, 812-41). The probation officer recommended the district court impose a four-level enhancement under U.S.S.G. § 3B1.1(a). (J.A. Vol. III, 823). Salam objected to this enhancement. (J.A. Vol. II, 741-42; 767; 771-73). The district court,

however, overruled Salam's objection, adopted the probation officer's findings in the PSR and imposed a four-level upward adjustment to Salam's offense level. (J.A. Vol. II, 775; 785-86).

The district court's imposition of this four-level role adjustment was clearly erroneous. Section 3B.1.1(a) of the Guidelines provides:

> Based on the defendant's role in the offense, increase the offense level as follows:
>
> (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

U.S.S.G. § 3B1.1(a).

Role enhancements under U.S.S.G. § 3B1.1 apply only in narrow circumstances. Elevated role enhancements are reserved for persons who exercise extensive and continuous supervision over their co-conspirators. United States v. Cameron, 573 F.3d 179, 186 (4th Cir. 2009). Active control by the defendant over others in the criminal enterprise is the sine qua non of Section 3B1.1 role adjustments. See Cameron, 573 F.3d at 186 (reversing trial court's imposition of four-level enhancement under Section 3B1.1(a)); United States v. Slade, 631 F.3d 185, 190 (4th Cir. 2011) (reversing as plain error trial court's imposition of three-level enhancement under Section 3B1.1(b)); United States v. Sayles, 296 F.3d 219, 226 (4th Cir. 2002) (reversing two-level enhancement under Section 3B1.1(c)).

The government did not prove Salam exercised active control over five or more subordinates. Salam did not define his alleged co-conspirator's distribution territories, select their customers, or set their sales prices. Evidence that Salam *supplied* these subordinates is not evidence he *controlled* their illicit activities. *Slade*, 631 F.3d at 191 (reversing role enhancement as plainly inapplicable because "[a]lthough Slade supplied large quantities of drugs to some co-conspirators who, in turn, sold those drugs to their clientele, there is simply no evidence that Slade exercised any supervisory responsibility over these persons by controlling them or directing the terms of their sales.").

The district court expressly adopted the probation officer's findings with respect to this role adjustment. These findings include paragraph 35 of the PSR, where the probation officer acknowledged the charged conspiracy was a loose confederation. Salam was a "point of contact" in Roanoke for members of this loose confederation, the probation officer found.

> Though the group of associates was loosely organized as those involved sometimes bought and sold with each other, Salam was the point of contact for the heroin to be further distributed to dealers in Roanoke.

(J.A. Vol. III, 822).

A defendant's status as a "point of contact" within a loosely formed conspiracy to distribute narcotics does not render him an organizer or leader of a

criminal organization within the meaning of U.S.S.G. § 3B1.1. *Slade*, 631 F.3d at 191. Salam's sentence therefore must be vacated.

## CONCLUSION

For the forgoing reasons, the Court should reverse Salam's convictions and enter judgment of acquittal. Alternatively, the Court should vacate Salam's convictions and grant him a new trial. In the event the Court upholds Salam's convictions, his sentence should be vacated and this matter should be remanded for resentencing to a term in prison that is substantially less than 292 months.

## REQUEST FOR ORAL ARGUMENT

Salam respectfully requests an opportunity to argue orally in support of this appeal. Oral argument would assist the Court evaluate the several legal issues raised by Salam's appeal of the district court's Judgment.

Respectfully submitted,

/s/Paul G. Beers
Paul G. Beers

Paul G. Beers (VSB # 26725)
Glenn, Feldmann, Darby & Goodlatte
37 Campbell Avenue, S.W.
P. O. Box 2887
Roanoke, Virginia 24001-2887
Telephone (540) 224-8000
Facsimile (540) 224-8050
E-mail: pbeers@glennfeldmann.com
Counsel for Rauf Abdul Salam

### <u>CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) OR 32(a)</u>

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because this brief contains 9,095 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14 point Times New Roman.

/s/Paul G. Beers
Paul G. Beers
Dated:  November 3, 2014

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of November, 2014, I caused the Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

R. Andrew Bassford
Office of the U.S. Attorney
P. O. Box 1709
Roanoke, VA 24008-1709
(540) 857-2935

*Counsel for Appellee*

I further certify that on this 3rd day of November, 2014, I caused the required copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk of the Court and a copy of the Sealed Volume of the Joint Appendix to be served, via U.S. Mail, postage prepaid, upon counsel for the Appellee, at the above address.

/s/Paul G. Beers
*Counsel for Appellant*