IN THE

# United States Court of Appeals
### FOR THE FOURTH CIRCUIT

RECORD NO. 14-4562

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

RAUF ABDUL SALAM,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT ROANOKE

## RESPONSE BRIEF OF APPELLEE

ANTHONY P. GIORNO
Acting United States Attorney

R. ANDREW BASSFORD
DANIEL P. BUBAR
Assistant United States Attorneys
FRANKLIN SACHA
Appellate Intern
P.O. Box 1709
Roanoke, Virginia 24008-1709
(540) 857-2250 - Telephone
(540) 857-2614 - Facsimile
*Counsel for Appellee*

# TABLE OF CONTENTS

Page No.

TABLE OF AUTHORITIES ......................................................................... iii

STATEMENT OF SUBJECT MATTER
AND APPELLATE JURISDICTION ..........................................................1

STATEMENT OF THE ISSUES.................................................................1

STATEMENT OF THE CASE AND FACTS ........................................2

SUMMARY OF THE ARGUMENTS ..................................................14

ARGUMENTS ........................................................................................16

  I.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN
       DENYING PORTIONS OF SALAM'S MOTION TO EXCLUDE
       TESTIMONY OF GOVERNMENT EXPERT.............................................16

  II.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY
       ADMITTING THREE OUT-OF-COURT STATEMENTS PURSUANT TO
       THE CO-CONSPIRATOR EXCEPTION TO THE HEARSAY RULE......25

III.   TESTIMONY CONCERNING HEROIN DISTRIBUTION IN NEW
       JERSEY WAS NOT UNDULY PREJUDICIAL TO SALAM UNDER
       RULE 403 BECAUSE THIS NEW JERSEY OPERATION WAS PART OF
       SALAM'S CONSPIRACY ..........................................................37

IV.   THE DISTRICT COURT PROPERLY REFUSED A "MULTIPLE
       CONSPIRACIES" INSTRUCTION BECAUSE THE GOVERNMENT
       CHARGED AND PROVED THAT A SINGLE CONSPIRACY EXISTED
       IN THIS CASE .............................................................43

i

V.    THE PROSECUTION'S ARGUMENT DURING ITS REBUTTAL
      CLOSING WAS APPROPRIATE, AND WAS DIRECTLY INVITED BY
      SALAM'S ARGUMENT IN CLOSING ......................................................44

VI.   THE DISTRICT COURT PROPERLY APPLIED A FOUR-LEVEL
      SENTENCING ENHANCEMENT UNDER U.S.S.G. § 3B.1.1(a)
      BECAUSE SUFFICIENT EVIDENCE ESTABLISHED THAT SALAM
      ORGANIZED AND LED THE HEROIN DISTRIBUTION
      CONSPIRACY ..............................................................................................55

CONCLUSION .........................................................................................................63

STATEMENT CONCERNING ORAL ARGUMENT ...........................................64

CERTIFICATE OF COMPLIANCE .......................................................................64

CERTIFICATE OF FILING AND SERVICE ........................................................65

# TABLE OF AUTHORITIES

## SUPREME COURT CASES

*Berger v. United States*, 295 U.S. 78 (1935) ................................................. 45

*Bourjaily v. United States*, 483 U.S. 171 (1987) ......................................... 26

*United States v. Olano*, 507 U.S. 113 (1993) ......................................... 44, 45

*United States v. Young*, 470 U.S. 1 (1985) ....................................... 44, 46, 47

## COURTS OF APPEAL CASES

*Bates v. Lee*, 308 F.3d 411 (4th Cir. 2002) .................................................... 46

*United States v. Banks*, 10 F.3d 1044 (4th Cir. 1993) ............................ 39, 41

*United States v. Baptiste*, 596 F.3d 214 (4th Cir. 2010) ................... 16, 17, 19

*United States v. Barile*, 286 F.3d 749 (4th Cir. 2002) .................................. 24

*United States v. Bartley*, 230 F.3d 667 (4th Cir. 2000) ................................ 58

*United States v. Blevins*, 960 F.2d 1252 (4th Cir. 1992) ........................ 28, 36

*United States v. Cameron*, 573 F.3d 179 (4th Cir. 2009) ............................. 57

*United States v. Crockett*, 813 F.2d 1310 (4th Cir. 1987) ........................... 34

*United States v. Curry*, 993 F.2d 43 (4th Cir. 1993) .................................... 45

*United States v. Francisco*, 35 F.3d 116 (4th Cir. 1994) ............................. 46

*United States v. Gastiaburo*, 16 F.3d 582 (4th Cir. 1994) ........................... 19

*United States v. Graham*, 711 F.3d 445 (4th Cir. 2013)........25, 26, 33, 35-37

*United States v. Grimmond*, 137 F.3d 823 (4th Cir. 1998)........................... 42

*United States v. Grubb*, 527 F.2d 1107 (4th Cir. 1975)................................ 33

*United States v. Harris*, 39 F.3d 1262 (4th Cir. 1994) ........................... 57, 60

*United States v. Hickman*, 626 F.3d 756 (4th Cir. 2010)............................. 43

*United States v. Hines*, 717 F.2d 1481 (4th Cir. 1983)...............27, 35, 39-41

*United States v. Johnson*, 587 F.3d 625 (4th Cir. 2009)................... 29, 30, 46

*United States v. Jones*, 356 F.3d 529 (4th Cir. 2004) ................................. 59

*United States v. Kellam*, 568 F.3d 125 (4th Cir. 2009) ................................ 59

*United States v. Kennedy*, 32 F.3d 876 (4th Cir. 1994) ................................ 44

*United States v. Mohr*, 318 F.3d 613 (4th Cir. 2003) .................................. 38

*United States v. Molovinsky*, 688 F.2d 243 (4th Cir. 1982 ) ........................ 54

*United States v. Neal*, 78 F.3d 901 (4th Cir. 1996) ................................ 26, 27

*United States v. Nunez*, 432 F.3d 573 (4th Cir. 2005) ............... 39, 40, 41, 42

*United States v. Ollivierre*, 378 F.3d 412 (4th Cir. 2004) ........................... 45

*United States v. Powers*, 59 F.3d 1460 (4th Cir. 1995) ............................... 42

*United States v. Pratt*, 239 F.3d 640 (4th Cir. 2001)............................. 32, 33

*United States v. Queen*, 132 F.3d 991 (4th Cir. 1997)................................. 41

*United States v. Safari,* 849 F.2d 891, 895 (4th Cir. 1988) ......................... 19

*United States v. Sayles*, 296 F.3d 219 (4th Cir. 2002)............................55-58

*United States v. Scheetz,* 293 F.3d 175 (4th Cir. 2002) ................................ 47

*United States v. Shores*, 33 F.3d 438 (4th Cir. 1994) ...................... 26, 27, 29

*United States v. Slade*, 631 F.3d 185 (4th Cir. 2011) ..................57-59, 61-63

*United States v. Smith*, 701 F.3d 1002 (4th Cir. 2012) ................................ 18

*United States v. Smith*, 441 F.3d 254 (4th Cir. 2006) ................................... 26

*United States v. Squillacote*, 221 F.3d 542 (4th Cir. 2000) ......................... 44

*United States v. Steffen*, 741 F.3d 411 (4th Cir. 2013) ........................... 57, 61

*United States v. Stockton*, 349 F.3d 755 (4th Cir. 2003) ........................ 38, 39

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996).............................. 43, 44

*United States v. Ward*, 171 F.3d 188 (4th Cir. 1999) .................................. 23

*United States v. West*, 877 F.2d 281 (4th Cir. 1989) .............................. 33, 45

*United States v. Whitehead*, 618 F.2d 523 (4th Cir. 1980).......................... 45

*United States v. Chin,* 981 F.2d 1275, 1279 (D.C. Cir. 1992)..................... 19

*United States v. Conrad*, 507 F.3d 424 (6th Cir. 2007)............................... 34

*United States v. Nacchio*, 555 F.3d 1234 (10th Cir. 2009).......................... 19

## UNPUBLISHED CASES

*United States v. Duarte*, 581 F. App'x 254 (4th Cir. 2014) .................. 29, 30

*United States v. Garrett*, 493 F. App'x 409 (4th Cir. 2012)......................... 42

*United States v. Gibbs*, 547 F. App'x 174 (4th Cir. 2013) .......................... 60

*United States v. Villareal-Marrero,* 574 F. App'x 254 (4th Cir. 2014) ....... 60

*United States v. Walker*, 191 F. App'x 205 (4th Cir. 2006) ........................ 54

## **FEDERAL STATUTES**

18 U.S.C. § 3231 ............................................................................... 1

18 U.S.C. § 3553(a) ......................................................................... 14

18 U.S.C. § 3661 ............................................................................. 57

18 U.S.C. § 3742 ............................................................................... 1

21 U.S.C. § 841 ................................................................................. 4

21 U.S.C. § 846 ................................................................................. 4

21 U.S.C. § 851 ................................................................................. 4

28 U.S.C. § 1291 ............................................................................... 1

## **RULES**

Fed. R. Crim. P. 16 ............................................................................. 5

Fed. R. Crim. P. 16(a)(1)(G) ..................................................... 17, 18

Fed. R. Evid. 403 .........................................................5, 39, 42-44

Fed. R. Evid. 404(b) .................................................................. 20, 24

Fed. R. Evid. 801 ...................................................................... 25, 26

Fed. R. Evid. 801(d)(2)(E) ................................................ 25, 26, 29

Fed. R. Evid. 802 ............................................................ 26

## **UNITED STATES SENTENCING GUIDELINES**

U.S.S.G. § 3B1.1 ...................................................... 56, 58

U.S.S.G. § 3B1.1(a) ........................................ 1, 13, 16, 55, 56

U.S.S.G. § 3B1.1(b) .......................................................... 56

U.S.S.G. § 3B1.1(c) .......................................................... 56

Rauf Abdul Salam, a/k/a Pierre Demaro Banks, a/k/a Radio, appeals the final

judgment of the United States District Court for the Western District of Virginia, a

court of original subject matter jurisdiction pursuant to 18 U.S.C. § 3231, entered

on July 18, 2014.  This appeal was timely noted on July 21, 2014.  JA 11[1].  The

United States Court of Appeals for the Fourth Circuit has appellate jurisdiction

pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

**STATEMENT OF THE ISSUES**

I.      Did the district court properly allow the testimony of the
        government's expert as to methods and patterns of illegal drug
        distribution?

II.     Were certain out-of-court statements of co-conspirators properly
        admitted under the co-conspirator hearsay exception?

III.    Was testimony about heroin distribution in New Jersey properly
        admitted as part of the proof of the charged conspiracy?

IV.     Did the government charge and prove a single conspiracy?

V.      Was the government's argument in its rebuttal closing an appropriate
        response to the closing argument made by Salam's counsel?

VI.     Whether the district court properly added four levels to Salam's
        offense level for being an  organizer or leader pursuant to U.S.S.G. §
        3B1.1(a)?

---

[1] Citations to the Joint Appendix are referenced with "JA _____."

1

## STATEMENT OF THE CASE AND FACTS

On August 30, 2012, Franklin County, Virginia Sheriff's deputies arrested a local heroin user. JA 222. This user then made a controlled telephone call to his supplier, Jonathan Seale, ordered additional heroin from Seale, and arranged a delivery. *Id*. Seale arrived as arranged, was arrested, and was found to possess the requested heroin. JA 225-27. The heroin bags bore a distinctive "Safe House" stamp. JA 229.

In turn, Seale cooperated with the authorities. He made recorded telephone calls to his supplier, someone named "Radio." JA 230, 264. Radio was a known Roanoke heroin dealer, so Franklin County turned the matter over to the Roanoke City Police Department. *Id*. Before taking any actions, the Roanoke investigator showed Seale a picture of Rauf Abdul Salam ("Salam"), known on the street as "Radio." Seale identified Salam as his supplier. JA 295.

In the first recorded call, Seale asked for "a late dinner." JA 266, 692. Seale testified that this meant that he wanted a brick of heroin – the amount that he customarily obtained from Salam. JA 266-67. The person on the other end of the conversation was not confused by this request, and called back almost immediately, telling Seale that he had "put in an order for an 8-piece of crown." JA 267, 692. From previous dealings, Seale knew that this meant he would be

picking up the heroin at the Crown Chicken restaurant in Roanoke. JA 267. Seale identified the voice on the other end of the phone as being that of "Radio." JA 266.

Seale told the police that, although he ordered the heroin from Radio, it would be delivered by one of Radio's associates, someone Seale knew as "Chris." JA 259-60. Seale identified a picture of "Chris." JA 295. From this, police determined "Chris" to be Christopher Carter. Officers therefore watched Carter's residence to see what would happen when the controlled calls were made. JA 300. Shortly after the second controlled call, Carter left his residence in a vehicle driven by his girlfriend, Trina Richardson. They headed directly toward Crown Chicken, but were stopped by police shortly before arriving there. *Id*.

During this stop, police discovered a single brick of heroin on the ground outside the vehicle, near where Carter was standing. JA 301. These heroin bags were marked with the "Safe House" stamp. JA 302. Based on this, police obtained a search warrant for Carter's residence. JA 303.

In a shoebox under Carter's bed, police found an additional 16 bricks of heroin. JA 304. These bags were also stamped with the "Safe House" markings. JA 310. They also found $3,890 in cash. JA 311. This was noteworthy because Carter had no regular employment. JA 342, 348.

These events lead the police to further investigate Salam. They subsequently identified a number of witnesses to Salam's heroin trafficking activities. Based on this information, on March 21, 2013, a federal grand jury sitting in Roanoke returned an indictment charging Salam with conspiracy to distribute more than 1,000 grams of heroin, in violation of 21 U.S.C. §§846 and 841. JA 2. On February 26, 2014, the United States filed a notice under 21 U.S.C. §851, subjecting Salam to enhanced punishment if convicted, based on his prior drug felony convictions. JA 8.

Numerous motions were addressed by the district court prior to trial. JA 8-9, 17-54. Relevant here, on March 19, 2014, the United States provided amended notice that it intended to call certain expert witnesses during its case in chief. JA 8, 55. This was more than two weeks before trial. Specifically the United States announced that it intended to call a forensic chemist to testify to the nature of suspected drugs seized during the investigation. *Id*. The United States also announced that it intended to call Detective Vince Haddox to explain the methods and patterns of illegal drug distribution, as well as the effects of heroin on users. *Id*. The government's amended notice listed a number of items to which Haddox would testify, including "(1) the flow of heroin from source city to destination city and common source cities; (2) [s]treet drug prices in southwest Virginia for heroin,

…costs [to ]drug dealers …and [profits] from heroin; (3) [c]ommon distribution quantities of heroin . . .; (4) [h]ow heroin is packaged . . .; (5) [c]ommon street names for heroin; (6) [h]ow heroin is used; (7) [t]he effects of heroin on its users . . .; (8) [w]hat heroin addicts are like . . .; (9) [h]ow drug dealers often use a "dope" phone to communicate with their customers; (10) [h]ow drug dealers often speak in code when they are discussing illegal drugs, such as heroin, and/or drug deals on the telephone . . .; (11) [h]ow a standard drug deal is conducted; and (12) [t]he use of standard drug trafficking tools, including scales, firearms, and packaging materials." JA 57.

Salam moved to exclude this testimony under the terms of Federal Rule of Criminal Procedure 16, and Federal Rule of Evidence 403. JA 67. On April 2, 2014, after hearing argument, the district court ruled that the notice was sufficient to allow the government to call the expert as to the methods of heroin distribution, and that the calling of such an expert was an extremely routine matter. JA 79,88, 95. The district court did prevent the government from using the witness to testify about the effects of heroin on users. JA 96-97.

Salam also moved to exclude the testimony of Detective Louis Renshaw, citing concerns about relevance and unfair prejudice. JA 76. In response, the government represented that other government witnesses would testify that Salam

was supplied by someone in New Jersey named "Malcolm," and perhaps identify Malcolm's picture. JA 103. Detective Renshaw would corroborate that there was in fact a heroin dealer in New Jersey named "Malcolm," could provide information from his personal knowledge about Malcolm's activities, and would identify Malcolm's picture. JA 103. The district court ruled that as long as there was a foundation, a link between the Roanoke conspirators and Malcolm, that Detective Renshaw's testimony would be admissible. JA 107.

The day before trial, Salam filed a Third Motion in Limine, seeking to prevent the government from introducing evidence arising after the charged end date of the conspiracy, alleging that such evidence would amount to constructive amendment of the indictment. JA 129-31. The district court denied this motion, asserting that it was not fatal error for evidence of drug activity after the end date of the conspiracy to be admitted as evidence. JA 140.

The trial began on April 7, 2014. JA 9, 133. The government's first witness was Sergeant David Lyle of the Franklin County Sheriff's Office. JA 220. He testified to the investigation of Jonathan Seale, and the seizure of heroin from Seale. JA 222-27. The heroin seized from Seale was packaged in bags marked with a "Safe House" stamp. JA 228. Lyle testified that Seale told investigators he was able to buy heroin from someone from Roanoke City that he knew as "Radio."

JA 230.  Given this information, Lyle contacted Roanoke City detectives, and turned Seale over to them.  JA 230.

Jonathan Seale was the next witness.  JA 243.  Seale testified about how he became a heroin addict, and the effects of heroin addiction on his life.  JA 244-47. He testified about being stopped by the police with heroin on August 30, 2013.  JA 248.  Seale testified that he first met Salam because he used heroin with Salam's sister, Pam.  He further testified about how Pam supplied Seale with heroin; and about how he came to learn that this heroin was actually coming from Salam.  JA 250-53.

Seale began dealing directly with Salam. JA 255.  Salam gave Seale his phone number, and they developed routine ways of doing business.  JA 257.  Seale admitted to reselling some of the heroin that he obtained from Salam to pay for what he consumed.  JA 257.  Salam would often "front" the heroin to Seale.  JA 268.  Eventually, Seale's dealings with Salam started taking place through someone that Seale knew as "Chris."  JA 259.  Seale described Chris as Salam's runner.  *Id*.  Seale would call Salam, and order heroin.  Salam would tell Seale where to go to meet Chris, and Chris would meet Seale at the designated location with the requested drugs.  JA 260.

Trina Richardson next testified to the events of the night when Christopher Carter, her boyfriend, was arrested on heroin charges. JA 343-48. She testified that immediately prior to that evening's encounter with the police, Carter had received a telephone call. JA 344. She did not know who the call was from, but Carter immediately told her that he had an errand to run for "Little Shorty," and that Carter wanted her to drive. *Id.* She took this to mean that the errand was on behalf of Salam, who was in fact short in stature. *Id.* She further testified that she had previously driven Carter on similar errands, at Salam's direction, to places such as Crown Chicken and Auto Zone. JA 341-42, 370. She once saw Carter meet with a white man driving a green Subaru. JA 342. Seale drove a green Subaru. JA 225. Richardson also testified to Carter meeting with Michael Payne. JA 350.

After Richardson's testimony, the government called Detective Vincent Haddox of the Roanoke City Police Department, testifying as an expert in the methods and patterns of illegal drug distribution. Subject to *voir dire* by counsel for Salam, he was ultimately qualified as an expert. JA 384-85. Salam did not object to his qualifications or expertise. *Id.* Haddox then testified about heroin, the heroin trade in general, and how heroin was normally transacted in and around Roanoke. JA 380- 405.

The next witness was a cooperating federal defendant named Antonne Day, also known as "Squeak." JA 406. Day testified that he had known Salam for a number of years, and made arrangements through Salam's sister, Pam Banks, to start selling Salam's heroin. JA 410-11. Over the course of this relationship, Salam routinely fronted Day as many as three to five bricks of heroin a day. JA 411-12. On two occasions, Day pooled his money with Salam to obtain heroin from Salam's New Jersey source. JA 415. On one of those occasions, he obtained ten bricks of heroin through Salam. JA 413. Twice, at Salam's direction, he wired money to Malcolm Hayes in New Jersey. JA 415.

Day confirmed the relationship between Salam and Carter, testifying that Carter delivered heroin for Salam. JA 418-19. Day testified how Salam told him that Carter had been arrested while delivering a brick of Salam's heroin to Seale. JA 419. Day had previously met Seale through Pam Banks, and knew that he drove a green Subaru. JA 420. Because of this, Day listened to the recording of the call between Seale and Salam, and was able to correctly identify both of the voices on the recording. JA 422.

Chmar Russell, a cooperating federal defendant, then testified to his interactions with Salam. JA 438-59. Salam attempted to recruit Russell to sell heroin for him. JA 443. As part of this effort, Salam allowed Russell to watch him

sell heroin, and discussed his heroin business.  JA 444-46.  Russell identified

Carter and Day, and connected them to Salam.  JA 448-50.   Russell recognized

Salam's voice when the recording between Salam and Seale was played.  JA 451-

52.

Another federal defendant, Michael Payne, testified that Salam recruited him

into the heroin business, first fronting him a quantity of heroin to help him raise

money for living expenses.  JA 528-29.   Payne quickly sold this heroin, paid

Salam off, and thereafter obtained additional heroin from Salam.  JA 531.

Eventually, Salam directed Payne to get his heroin through Christopher Carter.  *Id*.

Carter, in turn, advised Payne that the heroin came from Salam.  JA 533.   Once

Carter was arrested, Payne started receiving larger quantities of heroin directly

from Salam, often fronted.  JA 536-7.   Payne pooled money with Salam to obtain

heroin out of New Jersey.  JA 539-40.

Eventually, Salam stopped being able to supply Payne.  JA 541.   Pam

Banks, Salam's sister, then introduced Payne to Malcolm in New Jersey.  At this

meeting, Payne confirmed that Malcolm was Salam's source of supply.  JA 542-

45.  Payne identified Malcolm's picture.  JA 542.  Malcolm told Payne that he had

stopped supplying Salam because Salam was at least $60,000 in debt with

Malcolm.  JA 546-47.  Payne then started routinely distributing Malcolm's heroin

into Roanoke. JA 548. Payne identified Salam's voice on the recorded telephone call between Salam and Seale. JA 550.

Pam Banks was also linked to Karen Thompson, the government's next witness. JA 504-05. Thompson, a long-time heroin addict, routinely bought heroin from, and used heroin with, Pam. JA 505. Through this routine contact, she spent significant time in the residence where Pam and Salam lived. JA 510. She observed the heroin-related interactions between the two, and watched heroin transactions taking place. JA 508, 510. She also met Seale there, as he interacted with Pam. JA 505.

The government next called Jessica Brown as a witness. JA 460. Brown, a heroin addict, was routinely supplied by Louis Brown, a co-defendant in this case. JA 461, 465. Jessica would sometimes order heroin from Louis, but he would not be able to give her what she wanted. JA 469. On those occasions, Jessica would accompany Louis to meet his heroin supplier. *Id*. She did this because she did not trust Louis Brown with her money. *Id*. These meetings would be set up with short, cryptic telephone calls that demonstrated a shared understanding of purpose and meeting location. JA 470. At these meetings, Jessica saw Salam supply Louis. JA 468. She also observed Louis obtain more heroin from Salam than what she had ordered. JA 472, 474. Some of the heroin obtained from Salam had the

"Safe House" stamp on it.  JA 475.  She observed at least four of these meetings. JA 473.

The government's final witness was Detective Louis Renshaw.  JA 557. Salam did not object to Renshaw's testimony at the time that he was called.  *Id*. Detective Renshaw, a police officer from New Jersey, testified about investigating a large-scale heroin trafficking ring in New Jersey.  He testified that Malcolm Hayes was in fact a significant New Jersey heroin dealer.  JA 558-62.  This corroborated the testimony about Malcolm provided by Day and Payne.  Id. Renshaw identified Hayes' picture and detailed an amount of heroin for which he knew Hayes was personally responsible.  JA 558, 561-62.

At the close of the government's evidence, Salam moved for a judgment of acquittal, claiming insufficient evidence.  JA 564.  Salam also asserted that the government's evidence showed the presence of multiple conspiracies.  *Id*.  Salam sought the issuance of a multiple conspiracy jury instruction that he had earlier proffered to the district court.  JA 119-20.  The district court found that the case came down the jury's determination of the credibility of the witnesses, and therefore declined to grant Salam's motion for a judgment of acquittal.  JA 565. The district court also found that there was no evidence of multiple conspiracies, and so did not allow a jury instruction to that effect.  JA 566, 569.

Salam elected not to testify, and did not call any witnesses on his behalf. JA 572. Closing arguments took place on April 9, 2014. JA 582. The jury ultimately returned a guilty verdict. JA at 669.

On April 22, 2014, Salam moved for a judgment of acquittal, alleging insufficient evidence and seeking a new trial or mistrial on grounds that the district court refused to strike a juror for cause, that the district court improperly refused to give requested jury instructions, and that the prosecutor engaged in improper argument. JA 10, 727.

The district court denied this motion by written order dated April 28, 2014. JA 729. The court found that the evidence was sufficient to convict, that its refusal to strike a juror for cause was justified, and that the facts of the case did not support Salam's proposed jury instructions. JA 729-31. The court also found that the prosecution's comments in rebuttal were appropriate responses to Salam's closing argument, and thus not improper. JA 733. The court further found that even had the comments been improper, they would not have been so unfair as to create a mistrial. JA 733-34.

Salam was sentenced on July 14, 2014. He objected to the four-level guidelines enhancement for a leadership role pursuant to U.S.S.G. § 3B1.1(a). JA 764, 767. The district court overruled Salam's objection, finding that the

government had shown, by a preponderance, that Salam managed or controlled other people in the course of the conspiracy. JA 775.

Salam conceded that, technically, he was a career offender, but asserted that the predicate convictions were too old to be relevant, and so he should not face treatment as a career offender. JA 777. The district court agreed, and treated Salam as if he were not a career offender. JA 785-86.

Ultimately, the district court found Salam had a total offense level of 36, and a criminal history category of V, corresponding to a sentencing guidelines range of 292 to 365 months of incarceration. JA 786. Salam argued for a variant sentence down to his statutory minimum mandatory sentence of 240 months of incarceration. JA 790. The district court reviewed the 18 U.S.C. §3553(a) factors, and imposed a low-end guidelines sentence of 292 months of incarceration. JA 796.

Salam thereafter appealed his conviction and sentence. JA 810.

## SUMMARY OF THE ARGUMENTS

I.  Salam had adequate notice of the government's intent to call an expert witness in methods and patterns of illegal drug distribution. Such witnesses are common in drug conspiracy cases, and the use of such an expert did not surprise or otherwise improperly prejudice Salam.

II.     The district court established that Salam was part of a drug conspiracy

        before allowing the admission of hearsay statements made by co-

        conspirators in support of that conspiracy.  In the event that any of the

        district court's evidentiary rulings in this regard were erroneous, the error

        was harmless.

III.    Salam's heroin sources were in New Jersey, and the essence of his

        conspiracy was that he obtained his heroin in New Jersey and redistributed it

        in Virginia.  Because of this, it was appropriate for the government to

        introduce evidence about Salam's New Jersey sources of supply, and link

        them to Salam.

IV.     The evidence at trial showed that Salam was part of an overarching

        organization that exported heroin from New Jersey to Virginia.  Nothing in

        the evidence showed that he was part of some separate conspiracy. The court

        thus properly refused to give a multiple conspiracies instruction.

V.      Salam's counsel suggested in his closing argument that he disagreed with a

        jury instruction, and that the government should have introduced certain

        evidence that would actually have been hearsay.  The government was

        entitled to respond to these assertions to "right the scales."  The

government's statements in rebuttal were both invited and appropriate, and did not violate Salam's due process rights.

VI.    The district court properly added four levels under § 3B1.1(a) to Salam's guideline offense level where the evidence established by a preponderance of evidence that he was an organizer or leader of a criminal activity involving five or more participants.

## ARGUMENTS

## I.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DENYING PORTIONS OF SALAM'S MOTION TO EXCLUDE TESTIMONY OF GOVERNMENT EXPERT.

Standard of Review

Salam challenges the district court's partial denial of his Motion to Exclude Testimony of Government Expert.  Br. of Appellant at 15-21.  The admissibility of expert testimony is governed by Federal Rule of Evidence 702.  *United States v. Baptiste*, 596 F.3d 214, 222 (4th Cir. 2010).  Pretrial rulings regarding the admission of expert testimony are reviewed on appeal for abuse of discretion.  *Id.*

Discussion

On March 19, 2014, almost three weeks prior to trial, the United States filed its Amended Notice of Intent to Use Expert Witness, announcing its intention to

call Detective Vince Haddox as an expert in the methods and patterns of illegal drug distribution. JA 55-58. The Notice detailed Haddox's qualifications, and identified twelve subject areas about which Haddox would testify. *Id.* These included matters regarding heroin distribution, source and destination cities, typical quantities, packaging and prices for heroin, street names and codes for heroin, how heroin is used and its effects on users. JA 57-58.

On March 28, 2014, Salam filed his Motion to Exclude Testimony of Government Expert. JA 67-69. Salam asserted that the Government's Amended Notice was insufficient under Federal Rule of Criminal Procedure 16(a)(1)(G) and that the admission of topics six through eight of the Amended Notice, regarding the effects of heroin on its users, would unfairly prejudice him.[2] *Id.*

On April 2, 2014, after verifying that Haddox would not also be a fact witness, the district court explained that law enforcement expert testimony regarding the methods and patterns of narcotics distribution is commonplace—that the court and counsel understand what such testimony would be, given their familiarity with narcotics prosecutions, but that such testimony is helpful to jurors,

---

[2] Salam did not object in his Motion or at trial to Haddox's qualifications as an expert or that his testimony be excluded for any other reasons than those stated in his Motion.

"who may not be as familiar, who need to have an expert's input to help them understand what is being said." JA 95.

The court went on to hold that the notice was sufficient, saying:

. . .I think that everyone understands what the import of this expert's testimony will be, . . .. He's going to talk about distribution of heroin. He's going to talk about how much he has received for heroin, how exchanges take place, what people take for heroin on occasion. I understand that to be one of the elements of this case.[3]

JA 96-97. The court did not abuse its discretion in so ruling.

A.    Courts routinely allow law enforcement officials to testify regarding the manner and means of narcotics distribution.

Federal Rule of Criminal Procedure 16(a)(1)(G) requires that, if requested, the government must produce a written summary of expert testimony it intends to introduce at trial in its case in chief. Fed. R. Crim. P. 16(a)(1)(G). The summary must describe the expert's opinions, the bases and reasons for those opinions, and his or her qualifications. *Id.* This Rule "is intended to minimize surprise that often results from unexpected expert testimony . . . and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." *United States v. Smith,* 701 F.3d 1002, 1007 (4th Cir. 2012)(quoting Fed. R. Crim. P. 16(a)(1)(G) Advisory Comm. Note (1993 amendment).

_____

[3] The court ruled in Salam's favor regarding paragraphs six through eight, pertaining to the effects of heroin. JA 96-97.

A written summary of proposed expert testimony required by Rule 16, "falls far short of the 'complete statement' required of litigants in civil cases." *United States v. Nacchio*, 555 F.3d 1234, 1262 (10th Cir. 2009). "In particular, Rule 16 does not require experts in criminal cases to provide written reports explaining their opinions or to make a written proffer containing the information required under the civil rules." *Id.*

Courts routinely allow expert testimony from law enforcement officials regarding narcotics distribution. *See United States v. Gastiaburo*, 16 F.3d 582 (4th Cir. 1994) (citing *United States v. Safari,* 849 F.2d 891, 895 (4th Cir.) *cert. denied,* 488 U.S. 945 (1988); *Baptiste* at 222-23. "[E]xpert testimony on the *modus operandi* of criminals 'is commonly admitted,' particularly regarding the methods of drug dealers." *United States v. Chin,* 981 F.2d 1275, 1279 (D.C. Cir. 1992).

B.    The government satisfied the Rule 16 notice requirements.

The government provided its Amended Notice on March 19, 2014—well before the start of trial. JA 55-58. This notice covered Haddox's qualifications, experience, and the twelve proposed areas about which he would testify. *Id*. at 56-57. The district court did not abuse its discretion in denying, in part, Salam's motion to exclude Haddox because the government complied with its Rule 16 disclosure obligations, and Salam was not surprised or unable to effectively cross-

examine Haddox.  Salam challenges three portions of Haddox's trial testimony as evidence of the government's insufficient disclosure; none of them demonstrate error in the district court's ruling.  Br. of Appellant at 17.[4]

First, although Salam acknowledges that the government's Notice stated that Haddox would testify or opine about the flow of heroin "from source city to destination city and common source cities," he argues that the Notice failed to specify which source cities would be identified. *Id.*  Salam points out that Haddox testified that heroin tends to flow from larger source cities to Roanoke and that the larger source cities include New York and Paterson, New Jersey.  Br. of Appellant at 18; JA 386.  This testimony was consistent with the Amended Notice, which stated, "Haddox will testify or opine about the following matters [: . . .] (1) The flow of heroin from source city to destination city and common source cities[.]" JA 57.  Salam was on notice in advance of trial that Haddox would testify about the relevant source cities.   Significantly, it was clear to Salam from the discovery materials disclosed in preparation for trial, that the government's case would establish that drugs in this conspiracy came to Roanoke from New York and Paterson, New Jersey.

---

[4] Salam did not object to  Haddox's  testimony, other than to the relevance of testimony about firearms, pursuant to Fed. R. Evid. 404(b), which the district court overruled, consistent with his pre-trial ruling on the issue.  (JA 52, 137-40, 386, 393-96.)  .

Salam's counsel even attached a chart of the related New Jersey heroin network to his motion requesting that the court exclude the testimony of Detective Renshaw. JA 98-99. Though Salam was arguing that he was not involved in the New Jersey operation, "Operation Dismayed," he clearly understood the government's purpose in putting on this testimony, when he argued, "[t]hey say that his source is a middle-level manager, this gentleman in the middle [of the chart] named Mr. Hayes, Malcolm Hayes. They say that's where Mr. Salam was getting heroin." JA 99. Further, Salam's counsel stated that this "is a big part of their case - - or a part of their case." JA 98.

Salam agrees that Paterson, New Jersey is about 21 miles from New York City. Br. of Appellant at 18. This fact, in conjunction with the language in the expert witness notice, and the fact that the government's pleadings (and discovery) put Salam on notice that its case would establish that he was receiving drugs from New Jersey/ New York City. Thus, when the notice of expert testimony indicated that Haddox would testify about the flow of heroin from source city to destination city, and common source cities, and especially where Haddox's testimony related only to Paterson, New Jersey and New York as source cities for Roanoke, Virginia, the Notice was sufficient. Haddox testified consistently with the discovery

provided, and consistently with the summary in the notice.  The district court did not abuse its discretion by allowing this testimony.

Salam next claims that Haddox's testimony that drug dealers use the words "work" to refer to the selling of drugs makes the Amended Notice insufficient.  Br. of Appellant at 19-20 ; JA 395-96.  However, this testimony is also consistent with the Amended Notice, which stated, in part, that Haddox would testify about, "(10) How drug dealers often speak in code when they are discussing illegal drugs. . . ." JA 58.

Lastly, Salam argues that the government's Amended Notice failed to inform the defense that the expert "would testify drug dealers in Northern states such as New Jersey accept firearms as payment for heroin."  Br. of Appellant at 21. In its March 19, 2014 Amended Notice, the government stated that Haddox would testify regarding, "(12) The use of standard drug trafficking tools, including . . . firearms. . . .," JA 58.  Further, Salam was aware that evidence regarding the bartering of guns in exchange for heroin would be presented as evidence.  On March 5, 2014, Salam filed his First Motion in Limine regarding this issue, and asked the district court to exclude, "[a]ny evidence Salam allegedly carried, sold, or bartered firearms in exchange for heroin."  JA 17.  The district court denied that Motion in Limine, implicitly agreeing that firearms are recognized "tools of the

trade," and specifically holding that evidence regarding the bartering of guns for heroin would be admissible. JA 52. This Court has long held that firearms are well-recognized "tools of the trade" in the world of illegal drug business, and the district court properly recognized this point in ruling in the government's favor on the evidentiary issue. JA 52; *United States v. Ward*, 171 F.3d 188, 195 (4th Cir. 1999).

Salam revisited these matters at trial — the day before Haddox took the stand. Consistent with its prior ruling, the district court denied Salam's renewed motion. JA 139. At trial, Haddox agreed that firearms have greater value in northern states than in Virginia, giving them special significance when heroin is coming from a northern state, and making them a "tool of the trade."[5] JA 393.

Given Salam's pleadings, in which he acknowledges his awareness of the government's evidence, fulsome briefing, argument heard by the Court, and the district court's specific ruling that firearms in such contexts are recognized as "tools of the trade," it is clear that Salam had notice of the nature of Haddox's testimony. The government's Amended Notice specifically stated that Haddox's

---

[5] Salam objected to this testimony, again, based upon Rule 404(b) relevancy. The district court overruled the objection, allowing Haddox to testify regarding firearms' greater worth up north than in Virginia. (JA 393-94.) It is worth noting that Salam has not raised the issue of relevance of this testimony by Haddox or any other witness in the instant appeal.

testimony would include discussion of drug trafficking tools, including firearms. The district court did not abuse its discretion in permitting Haddox to testify on this issue.

Finally, Salam cites to *United States v. Barile*, 286 F.3d 749, 758-62 (4th Cir. 2002), in support of his argument. Br. of Appellant at 17. In *Barile*, this Court affirmed exclusion of portions of defendant's expert witness's testimony, but allowed the expert to testify generally about the Food and Drug Act submissions that were at issue in the case. *Barile* at 758-59. Specifically, the district court excluded the portions of the expert's proposed testimony regarding the materiality of the defendant's alleged false statements because the defendant's expert notice lacked specificity and did not describe the expert's opinions beyond the conclusions he had reached, or provide his reasons for reaching it. *Id.* at 758. The court also limited the expert's testimony because testimony regarding the materiality of the submissions would invade the province of the jury. *Id.* at 759.

The court did, however, allow the expert to testify regarding the procedure, practice and history of the FDA submissions, and even respond to hypothetical questions regarding those submissions, which this Court affirmed. *Id.* Such a ruling is akin to what the district court allowed in the instant case—that Haddox could testify regarding the relevant items disclosed in the Amended Notice,

including the methods and patterns of heroin distribution, the propriety of which has been repeatedly recognized by this and other courts.

For all the above reasons, the Notice was sufficient and the district court did not abuse its discretion in allowing Haddox to testify regarding these subjects. Accordingly, Salam's appeal should be denied.

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY ADMITTING THREE OUT-OF-COURT STATEMENTS PURSUANT TO THE CO-CONSPIRATOR EXCEPTION TO THE HEARSAY RULE.

Standard of Review

Salam objects to the district court's admission pursuant to Federal Rule of Evidence 801(d)(2)(E) of three out-of-court declarations by Salam's co-conspirators. Br. of Appellant at 21-25. Evidentiary rulings made by the district court are reviewed for abuse of discretion, which is "highly deferential;" meaning the ruling will not be reversed unless the ruling is "'manifestly erroneous.'" *United States v. Graham*, 711 F.3d 445, 453 (4th Cir. 2013). "The incorrect admission of a statement under the coconspirator statement exclusion from the definition of hearsay is subject to harmless error review." *Id.*

Discussion

Federal Rule of Evidence 801 defines hearsay as a statement, other than one made by the declarant while testifying at trial, offered to prove the truth of the

matter asserted.  Hearsay is generally inadmissible.  Fed. R. Evid. 802.  However, the Rules also define what is not hearsay.  FRE 801(d)(2)(E) includes, as one of the enumerated exclusions from the definition of hearsay, a statement offered against a party that is made "by a coconspirator of a party during the course and in furtherance of the conspiracy."  *Bourjaily v. United States*, 483 U.S. 171, 174 (1987); *United States v. Smith*, 441 F.3d 254, 261 (4th Cir.), *cert. denied*, 549 U.S. 903 (2006).

To admit such testimony, the Government must show by a preponderance of the evidence that a conspiracy existed, the declarant and the defendant were members, and the statements being offered for admission were made during the course of and in furtherance of that conspiracy.  *United States v. Neal*, 78 F.3d 901, 904-05 (4th Cir. 1996).  "A statement by a co-conspirator is made 'in furtherance' of a conspiracy if it was intended to promote the conspiracy's objectives, whether or not it actually has that effect."  *Graham* at 453.

"Statements made by a co-conspirator to a third party who is not then a member of the conspiracy are considered to be 'in furtherance' of the conspiracy if they are designed to induce that party either to join the conspiracy or to act in a way that will assist it in accomplishing its objectives."  *United States v. Shores*, 33 F.3d 438, 444 (4th Cir. 1994).  A statement may be properly found to be "in

furtherance" of a conspiracy even if it was not primarily made to further the conspiracy, as long as there is some reasonable basis to conclude its purpose was to further said conspiracy. *Id.*

To resolve these preliminary factual questions for admissibility, "the court may consider *all* evidence before it, whether admissible at trial or not, including the co-conspirator statements sought to be admitted." (emphasis in original) *Shores*, 33 F.3d at 442. *See also Neal*, 78 F.3d at 905. A trial judge is not required to set out on the record his reasons for admitting such co-conspirator statements, nor is a judge required to hold a hearing to determine the existence of a conspiracy before the statements can be admitted into evidence as hearsay exceptions. *United States v. Hines*, 717 F.2d 1481, 1488 (4th Cir. 1983); *United States v. Blevins*, 960 F.2d 1252, 1256 (4th Cir. 1992).

A. <u>Day's statement that Salam supplied him with heroin was in furtherance of the conspiracy.</u>

Salam complains that the district court erred in allowing Chmar Russell to testify that Antonne Day told Russell that Salam was Day's heroin supplier. Salam

argues that the statement was merely idle chatter, and not made in furtherance of the conspiracy.[6]

Russell met Salam because of Salam's connection to drugs. JA 442. Salam was selling heroin in 2012. JA 442-43. Salam tried to convince Russell to join Salam in selling heroin because Russell could make money more quickly. JA 443-44. Salam would introduce Russell to people who would buy heroin from Russell. JA 444. Salam let Russell watch him sell heroin on three occasions. JA 444-45. Despite Salam's offer, Russell did not join Salam in selling heroin because Russell was "stuck in [his] ways." JA 447.

Russell also testified that he knew "Squeak" (Day), also a witness in Salam's trial. JA 407, 448. While Day did not personally try to persuade Russell to join Salam's heroin conspiracy, Russell and Day discussed Salam's heroin conspiracy. Specifically, Russell testified that Squeak told him on the street that Salam was Squeak's heroin supplier. JA 448-49. Salam objected on the grounds of hearsay, the district court overruled the objection. JA 449.

Day's statement—that Salam was his heroin supplier—to which Russell testified at trial, must be understood in context. Salam had encouraged Russell to

---

[6] Notably, Salam does not object to this admission of testimony because he and Day were not co-conspirators or that the statements were made outside that conspiracy.

join his heroin conspiracy, and offered to set him up with customers so that that Russell could make faster money. JA 448-49. Salam allowed Russell to be present at a number of Salam's heroin sales, and to view him with heroin and a large amount of cash on other occasions. JA 444-46.

It is reasonable, then, that Russell would speak with Salam's heroin coconspirators to see if Salam was legitimate. While Russell testified that Day did not specifically try to convince him to join Salam's conspiracy, statements made by a co-conspirator to a third party may still help accomplish the conspiracy's objectives, and as such, are admissible pursuant to FRE 801(d)(2)(E). *Shores*, 33F.3d at 444. Accordingly, the district court did not clearly err when it allowed the admission of Day's statement that Salam supplied him with heroin.

### B. If the district court erred in admitting the Russell statement, the error was harmless.

Even if this Court finds that admission of the subject statement was error, it was harmless error. *United States v. Johnson*, 587 F.3d 625, 637 (4th Cir. 2009) ("Erroneously admitted evidence is harmless if a reviewing court is able to 'say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'"); *United States v. Duarte*, 581 F. App'x 254 (4th Cir.

2014)(unpublished) (Court held that coconspirator statement that was brief and supported by the live testimony of other witnesses amounted to harmless error).

It should be noted that during his cross-examination of Russell, Salam revisited this issue, himself twice confirming the conversation between Russell and Squeak. JA 456. Day was the government's very next witness. Day testified that he had known Salam for a number of years; regularly sold heroin for Salam, including quantities at the multiple brick level; that Salam fronted heroin to him; that he pooled his money with Salam to obtain additional heroin from Salam's New Jersey source; and even wired money to Malcolm Hayes in New Jersey at Salam's direction. JA 406-15.

This independent testimony by Day that Salam supplied him with heroin removes the possibility that the jury could have been improperly swayed by Russell's brief statement. Further, Day's testimony provided much greater detail, including amounts of heroin, associated prices, sources, etc. Because of the brevity of Russell's mention of Salam supplying heroin to Day, the United States' closing argument and rebuttal did not even mention Russell's testimony on this point. Accordingly, even if the district court's admission of Day's statement through Russell was error, it was harmless.

C. Payne's testimony that Hayes was Salam's supplier in New Jersey and that Salam had fallen into debt to Hayes was also in furtherance of the charged heroin conspiracy.

Salam next complains that the district court abused its discretion in admitting two statements from Michael Payne. Payne testified that Salam's sister, Pam Banks, and Malcolm Hayes both confirmed to Payne that Hayes had supplied Salam's heroin. JA 542-45. Payne further testified that Hayes told him that Hayes stopped supplying Salam because Salam owed Hayes between $60,000 and $80,000 for heroin. JA 546-47. Salam objected to these portions of Payne's testimony. JA 544-46.

After a bench conference regarding the role of Salam's sister, Pam Banks, in the conspiracy, and the timeframe of the conspiracy, the trial court held the statement regarding Banks was admissible, stating, "Again, the Court has found that the evidence now ties [Pam Banks] into this conspiracy that the government is trying to prove, and I think they've met that burden by a preponderance, so, yes, we'll let that testimony come in through this witness." JA 543-44. The court ruled similarly regarding Hayes' statements. JA 545.[7]

---

[7] These rulings were consistent with the district court's refusal to give a jury instruction regarding multiple conspiracies. In so ruling, the court found that Salam was part of the heroin conspiracy charged in the indictment, about which evidence was presented that Salam obtained heroin from New Jersey and distributed it in Roanoke. JA 731-32.

Salam now argues that the subject statements were made when Salam was no longer a member of the conspiracy—effectively arguing that Salam had withdrawn from the conspiracy. Br. of Appellant at 24. In support of this argument, Salam cites two cases—both of which are inapposite. First, Salam cites *United States v. Pratt*, 239 F.3d 640, 643 (4th Cir. 2001), as authority that when someone is no longer a member of a conspiracy, his statements cannot be in furtherance of or during that conspiracy and must be ruled inadmissible.

The facts in *Pratt* actually support affirming the district court's rulings. In *Pratt*, the defendant challenged the admission of communications made by coconspirators because he was no longer a member of the conspiracy. *Id*. The court determined that admission of the statements constituted error because at the time of the communications, the defendant was "likely" no longer a member of the conspiracy, as he had "already taken affirmative steps to withdraw from the conspiracy, namely agreeing to make a controlled delivery and telephoning [a coconspirator] in an effort to facilitate that controlled delivery." *Id*. at 644.

Importantly, the court noted that in order to withdraw from a conspiracy, the defendant must not only show affirmative acts that are inconsistent with the object of the conspiracy, but also communicate his withdrawal to his coconspirators. *Id*. The court held that cooperation with law enforcement does demonstrate

withdrawal from the conspiracy, and determined that the defendant was unable to communicate his withdrawal so that he could effectively cooperate. *Id.* Despite these findings of error, the court refused to reverse, given the wealth of other evidence implicating the defendant in the narcotics conspiracy.

It is well-settled law that it is the defendant's burden to establish his withdrawal from a conspiracy, and a "'mere cessation of activity in furtherance of the conspiracy is insufficient.'" *Graham*, 711 F.3d at 454; *United States v. West*, 877 F.2d 281, 289 (4th Cir. 1989). The defendant's withdrawal from a conspiracy requires actual proof. *United States v. Grubb*, 527 F.2d 1107, 1109 (4th Cir. 1975). A single conspiracy may still exist where different parties join and leave at different times, so long as the conspiracy has the same objective, nature and result. *United States v. Crockett*, 813 F.2d 1310, 1316-17 (4th Cir. 1987).

Unlike in *Pratt,* the instant record is void of any evidence that Salam withdrew from the heroin conspiracy or did anything to defeat it. Under the case law, Salam must show his withdrawal. The court cannot presume it. He has not done so. After his coconspirators began to get arrested, instead of cooperating with police, Salam notified Day of Carter's arrest and encouraged Day to continue dealing with Carter after Carter was released on bond. JA 420-21.

Salam was an important part of a heroin conspiracy, in which Salam obtained heroin from Hayes in New Jersey and distributed through others, including Pam Banks and Payne, in Roanoke. This conspiracy continued even after he ran up debt to Hayes; Pam Banks and Payne made sure that the heroin could continue to flow from Hayes in New Jersey, back to Roanoke. The challenged statements between Payne, Banks, and Hayes were not only made during this continued conspiracy, but also to further it, as it was vitally important to the conspiracy to find another individual (Payne) to convey heroin from Hayes into the Roanoke Valley.

Additionally, Salam argues that the district court's ruling regarding Payne's testimony should be reversed because it did not make a finding as to the statements' timing. In support of this argument, Salam cites *United States v. Conrad*, 507 F.3d 424, 430 (6th Cir. 2007). In *Conrad*, the court reversed the district court's admission of certain coconspirator statements because the district court did not make the requisite findings regarding the context and timing of the statements, and also erred because it did not apply the proper legal standards—preponderance of evidence. *Id*. at 430-31.

As has already been discussed, the district court in the instant matter correctly applied the preponderance of evidence standard regarding the admission

of coconspirator statements in this case.  JA 339-41, 544.  The district court also specifically considered the timing of the subject statements admitted through Payne and how they fit into the conspiracy.  Specifically, the district court inquired as to the period of time Pam Banks made the subject statement to Payne.  JA 543.  Counsel for the United States represented that it occurred before the November 30, 2012 date included in the indictment, as Hayes was arrested a month earlier in October.  *Id.*  Detective Louis Renshaw later testified that on October 12, 2012, Hayes was stopped with 425 bricks of heroin.  *Id.* at 558-61.  Further, Payne testified that while he was not certain as to the date, his trips to New Jersey to obtain heroin from Hayes may have occurred in late fall 2012.  *Id.* at 547.

Even though the district court did consider the context and timing of the subject statements by Pam Banks and Hayes, the court was not required to hold a hearing or make findings on the record regarding such evidentiary rulings.  *Hines*, 717 F.2d at 1488; *Blevins*, 960 F.2d 1252, 1256 .

*Graham* is instructive regarding both of Salam's arguments.  In *Graham*, the defendant challenged the court's admission of wiretap conversations of his coconspirators about the defendant's past debt.  711 F.3d at 452-53.  Like Salam, the defendant argued the tapes should have been excluded because: 1) the district court did not make explicit findings prior to admitting the statements, and 2) the

statements were "idle chatter" between his coconspirators and not made during or in furtherance of the narcotics conspiracy. *Id* at 453. This Court rejected Graham's first argument because a trial court is not required to hold a hearing to determine the existence of the conspiracy before admitting coconspirator statements or to "explain the reasoning behind the evidentiary ruling." *Id*. at 453 (*citing Blevins*, 960 F.2d at 1256 ). Again, in the instant case, despite the fact that it was not required to do so, the trial court held a short hearing—outside the presence of the jury—to determine the shape of the conspiracy and also separately considered the context and timing of the subject statements before admitting them.

Graham also argued that the various recordings, which contained conversations about collecting a debt owed by Graham to his other co-conspirators did not contain conversations made in furtherance of the conspiracy. *Id*. at 453-54. This Court also rejected these arguments. First, Graham had the burden of putting on evidence of his withdrawal from the conspiracy, which must be more than his simple cessation of activity in the conspiracy and include evidence that he took action to withdraw and communicated this to his coconspirators. *Id*. at 454. No such evidence existed. *Id*. Like *Graham*, Salam points to no evidence at all of his withdrawal from the conspiracy—nor to any communication of this withdrawal.

Salam's argument that the subject statements were not during and in furtherance of the conspiracy because he was no longer a part of the conspiracy must fail.

Finally, Graham argued that because the statements involved conversations between his coconspirators were about monies Graham owed them, they were not in furtherance of the conspiracy. *Id*. at 454. This Court also rejected this argument, as the conversations were necessary to determine the status of the conspiracy, its members and the monies owed to one another, and as such, they furthered the conspiracy.

In much the same way, the conversations between Payne, Pam Banks and Hayes were in furtherance of the conspiracy, as they discussed the members, monies owed, and future of the conspiracy—including Banks introducing Payne to Hayes and Hayes agreeing to use Payne as a conduit of heroin from New Jersey to Roanoke. As such, the statements were properly admitted into evidence.

### III. TESTIMONY CONCERNING HEROIN DISTRIBUTION IN NEW JERSEY WAS NOT UNDULY PREJUDICIAL TO SALAM UNDER RULE 403 BECAUSE THIS NEW JERSEY OPERATION WAS PART OF SALAM'S CONSPIRACY.

<u>Standard of Review</u>

A district court's decision regarding the admissibility of evidence is reviewed for abuse for discretion, and this Court "will not find an abuse unless a

decision was 'arbitrary and irrational.'"  *United States v. Mohr*, 318 F.3d 613, 618 (4th Cir. 2003).

<u>Discussion</u>

Salam argues that Detective Louis Renshaw's testimony concerning a New Jersey heroin transaction involving Malcolm Hayes is unduly prejudicial because it might have led the jury to hold Salam responsible for heroin distributed in New Jersey (as opposed to holding him responsible solely for heroin distributed in Virginia).  Br. of Appellant at 25-26.  This argument is closely related to the "multiple conspiracies" argument Salam makes in Part IV of his brief.  Salam asserts that these two conspiracies were unrelated, it was unduly prejudicial to allow Detective Renshaw to discuss the New Jersey heroin distribution, and improper for the district court to reject a proposed "multiple conspiracies" jury instruction.  Br. of Appellant at 25–27.  Because this "multiple conspiracies" argument underlies the arguments in Sections III and IV of Salam's brief, it will be addressed here in order to show why Detective Renshaw's testimony was not unfairly prejudicial under Rule 403.

A single conspiracy exists where "there is one overall agreement, or one general business venture."  *United States v. Stockton*, 349 F.3d 755, 762 (4th Cir. 2003) (internal quotation marks omitted).  A single conspiracy "can be

distinguished from multiple independent conspiracies based on the overlap in actors, methods, and goals." *Id.*; *see also United States v. Nunez*, 432 F.3d 573, 578 (4th Cir. 2005) ("The focus of a conspiracy is the single-mindedness to achieve a particular goal.").

Although a single conspiracy must involve one "overall agreement" or "business venture," it is "not necessary to proof of a conspiracy that it have a discrete, identifiable organizational structure." *United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1993). Indeed, the "requisite agreement to act in concert need not result in any . . . formal structure," because "frequently . . . contemporary drug conspiracies . . . contemplate[] and result[] in only a loosely-knit association of members." *Id.*

At trial, Government's counsel argued in response to Salam's multiple conspiracy objection that the evidence of the New Jersey distributors (along with other evidence at trial) would show "one chain flowing down from the top," with Salam receiving the drugs from New Jersey through Malcolm Hayes and then distributing them in Virginia. JA 104.

Fourth Circuit case law shows that drug conspiracies involving a distribution chain with multiple actors operating up and down the chain (even in different states) can qualify as single conspiracies. For example, in *Hines*, the evidence

established a two-tier conspiracy, with the first tier located in North Carolina and the second tier in Florida. 717 F.3d at 1484. The first tier had employees who acted as couriers, and a defendant connected the two conspiracies. *Id.* at 1484, 1490. Despite the fact that the tiers of this conspiracy were located in different states and one tier was a wholesaler (the North Carolina tier) and the other was the retailer (the Florida tier), the Court stated that this "chain conspiracy is not unlike other multi-level schemes that have been found to constitute a single conspiracy." *Id.* at 1490.

The Court also found that a single conspiracy existed in *United States v. Nunez*, 432 F.3d 573 (4th Cir. 2005). In *Nunez*, co-conspirators in Miami received drugs from Mexico, and worked with their counterparts to send the drugs to Washington, D.C. for distribution. *Nunez*, 432 F.3d at 578. The defendants operated as "conduit" for a co-conspirator in Washington, D.C. by helping move the drugs from Miami to Washington, by arranging their shipment from Mexico on airliners, packaging, and delivery. *Id.* The defendants located in Miami requested a multiple conspiracy instruction at trial, and on appeal argued that the district court had abused its discretion in denying their request, but this Court found that the evidence was "more than sufficient to justify the district court's determination that a single conspiracy was at work." *Id.*

The evidence in Salam's case shows a single conspiracy of the type seen in *Hines* and *Nunez*. Though it might have been "loosely-knit," *Banks*, 10 F.3d at 1054, trial testimony showed that it operated with the same goal—to move heroin from New Jersey and distribute it in Virginia. Salam operated as the key "conduit." He received the heroin from Malcolm in New Jersey and then distributed it in Roanoke. JA 822. Moreover, some of the dealers that Salam supplied developed their own contacts with Malcolm in order to buy heroin directly from him. JA 415, 539–48. Salam, though, served as the key "point of contact" for distribution between New Jersey and Virginia. JA 829. As *Hines* and *Nunez* illustrate, this type of loosely-organized group that operates with a single goal constitutes a single conspiracy.

If Malcolm and the New Jersey distribution operation were part of a single conspiracy funneling heroin to Roanoke, then Detective Renshaw's testimony was relevant. Any evidence that "tends to make the existence of a fact of consequence to an issue in the case 'more probable or less probable' than without the evidence is relevant and therefore, as a general proposition, admissible." *United States v. Queen*, 132 F.3d 991, 994 (4th Cir. 1997).

For evidence to be inadmissible under Rule 403, it is not enough that it be prejudicial—"[e]vidence that is highly probative invariably will be prejudicial to

41

the defense." *United States v. Grimmond*, 137 F.3d 823, 833 (4th Cir. 1998).

Instead, the evidence must be *unfairly* prejudicial, and the unfair prejudice must substantially outweigh the evidence's probative value. *Id.* The evidence must only be excluded "in those instances where the trial judge believes that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." *United States v. Powers,* 59 F.3d 1460, 1467 (4th Cir. 1995).

Detective Renshaw's testimony has probative value because he confirmed the existence of a New Jersey supplier named "Malcolm," thereby corroborating the testimony of other government witnesses. JA 557–62. His testimony showed the scope of the conspiracy and the source of Salam's heroin. Because the Government indicted Salam for distributing 1,000 grams or more of heroin, any evidence showing that Salam obtained and distributed larger amounts of heroin has probative value for the Government's case. *See, e.g.*, *United States v. Garrett*, 493 F. App'x 409, 412 (4th Cir. 2012)(unpublished).

Detective Renshaw's testimony regarding Malcolm Hayes and the New Jersey operation therefore has probative value, it was not unfairly prejudicial, and was properly admitted under the Rule 403 balancing test. For these reasons, Salam's appeal on this issue should be denied.

## IV. THE DISTRICT COURT PROPERLY REFUSED A "MULTIPLE CONSPIRACIES" INSTRUCTION BECAUSE THE GOVERNMENT CHARGED AND PROVED THAT A SINGLE CONSPIRACY EXISTED IN THIS CASE.

<u>Standard of Review</u>

The refusal to give a proposed jury instruction is reviewed for abuse of discretion. *United States v. Hickman*, 626 F.3d 756, 771 (4th Cir. 2010). The Court will reverse only when the proposed instruction "(1) was correct, (2) was not substantially covered by the court's charge to the jury, and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *Id*.

<u>Discussion</u>

Salam's argument that the district court improperly declined to enter a "multiple conspiracies" instruction fails for the same reason his Rule 403 objection does—the Government proved a single conspiracy. *See* Br. of Appellant at 27. As detailed above in Part III, the New Jersey distribution source was part of an overall conspiracy that reached into Roanoke, with Salam serving as a pivotal figure within the overall heroin supply chain.

Because the Government charged and proved a single conspiracy, a multiple conspiracies instruction was unwarranted. *United States v. Tipton*, 90 F.3d 861,

883 (4th Cir. 1996).  In other words, a multiple conspiracy instruction is "not required unless the proof at trial demonstrates that [Salam was] involved *only* in [a] separate conspirac[y] *unrelated* to the overall conspiracy charged in the indictment."  *United States v. Squillacote*, 221 F.3d 542, 574 (4th Cir. 2000); *see also United States v. Kennedy*, 32 F.3d 876, 884 (4th Cir. 1994).

The evidence admitted at trial simply did not show that Salam was involved only in a wholly separate conspiracy unrelated to the overall conspiracy charged. Instead, as the district court recognized, the evidence showed that Salam was part of a conspiracy that distributed New Jersey heroin in Roanoke.  JA 731.  For this reason, the district court's decision to reject a multiple conspiracy instruction was proper and should be affirmed.

## V. THE PROSECUTION'S ARGUMENT DURING ITS REBUTTAL CLOSING WAS APPROPRIATE, AND WAS DIRECTLY INVITED BY SALAM'S STATEMENTS IN CLOSING.

Standard of Review

If an objection to a prosecutor's conduct is timely made at trial, the appropriate standard of review is harmless error.  *United States v. Young*, 470 U.S. 1, 13 n. 10 (1985).  Where no objection was made, comments would be grounds for reversal only if they are plainly erroneous and affect the defendant's substantial rights.  *United States v. Olano*, 507 U.S. 725, 730 (1993).  Appellants bear the

burden of making a "specific showing of prejudice to satisfy the 'affecting substantial rights' prong of Rule 52(b)." *Id*. at 735. Correction of plain errors that affect substantial rights is not mandatory, but rests within our sound discretion. *Id*. at 735-36. The discretion should not be exercised unless the prosecutor's conduct, when viewed in context of the whole trial, " 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " *Id.* at 736. The denial of a motion for a mistrial will be reversed on appeal only for a clear abuse of discretion. *See West* at 287-88.

<u>Discussion</u>

Remarks by a prosecutor can constitute grounds for reversal where 1) the remarks were improper, and 2) the remarks so prejudicially affected the defendant's substantial rights so as to deprive him of a fair trial. *United States v. Curry*, 993 F.2d 43, 45 (4th Cir. 1993). Put another way, improper argument by the prosecutor is not grounds for reversal unless there is substantial prejudice as well as error. *United States v. Whitehead*, 618 F.2d 523, 528 (4th Cir. 1980). "(W)e recognize that great latitude is accorded counsel in presenting closing arguments to a jury." *United States v. Ollivierre*, 378 F.3d 412, 418 (4th Cir. 2004). In our adversary system, prosecutors are permitted to try their cases with "earnestness and vigor," *Berger v. United States*, 295 U.S. 78, 88 (1935), and "the

jury is entrusted within reason to resolve ... heated clashes of competing views."

*Bates v. Lee*, 308 F.3d 411, 422 (4th Cir. 2002).

Closing argument, in particular, is a time for energy and spontaneity, "not merely a time for recitation of uncontroverted facts." *United States v. Francisco*, 35 F.3d 116, 120 (4th Cir. 1994). It should not be subject to a voluminous code of courtroom etiquette. For if it were, prosecutors would be left to walk on egg shells, and the quality of advocacy would suffer. To be sure, there are some lines that prosecutors may not cross . . . but to parse through a prosecutor's closing statement for minor infelicities loses sight of the function of our adversary system, which is to engage opposing views in a vigorous manner. *United States v. Johnson*, 587 F.3d 625, 633 (4th Cir. 2009).

> "The [prosecutor's] remarks must be examined within the context of the trial.... In this context, defense counsel's conduct, as well as the nature of the prosecutor's response is relevant. Indeed most Courts of Appeals ... have refused to reverse convictions where prosecutors have responded reasonably in closing argument to defense counsel's attacks, thus rendering it unlikely that the jury was led astray..... [T]he issue is not the prosecutor's license to make otherwise improper remarks, but whether the prosecutor's 'invited response,' taken in context, unfairly prejudiced the defendant. In order to make an appropriate assessment, the reviewing court must not only weight the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo. Thus the import of the evaluation has been that if the prosecutor's remarks were "invited," and did no more than respond substantially in order to "right the scale," such comments would not warrant reversing a conviction."

*Young*, 470 U.S. at 12-13.(internal citations omitted).

To determine whether prosecution remarks were prejudicial, this Court looks at

"1) the degree to which the remarks had a tendency to mislead the jury and to prejudice the defendant; 2) whether the remarks were isolated or extensive; 3) absent the remarks, the strength of competent proof introduced to establish the guilt of the defendant; 4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; 5) whether the prosecutor's remarks were invited by improper conduct of defense counsel; and 6) whether curative instructions were given to the jury."

*United States v. Scheetz,* 293 F.3d 175, 185-86 (4th Cir.), *cert. denied*, 537 U.S. 963 (2002)(internal citation omitted).

These factors are examined in the context of the entire trial, and no one factor is dispositive. *Id*.

Salam argues that the government made three improper arguments in its rebuttal argument. Br. of Appellant at 30. For the reasons below, Salam's claims should be denied.

In its closing argument, the government told the jury about an investigative techniques jury instruction, which it anticipated would be given by the court.[8] JA 595. The court did instruct the jury later, saying, "law enforcement or investigative techniques are simply not your concern. Instead, your concern is

_____

[8] The government anticipated a "no concrete evidence" argument in light of the defense opening in this case.

47

whether the evidence which was admitted proved the defendant's guilt beyond a reasonable doubt." JA 646. In closing argument, counsel for the United States said:

> Now, the defense may try to make a big deal about the lack of what Mr. Beers called in his opening "law enforcement evidence." By the way, that's not a term that the Judge will use in his instructions. Forensic evidence? "CSI" evidence? This is real life. This is not a TV show.
>
> Some of these things aren't present. Radio didn't give his dealers receipts for heroin. He didn't accept credit cards. Radio changed his phone a lot. Certain phones were recovered. Carter's phone was locked, and remember what Detective Haddox said about a locked phone, you can't get in a locked phone even with a search warrant. You heard that Seale's phone had been broken, nothing could be done with that.
>
> Ultimately, what the government does to put its case together before trial, that's what that's about. The Judge is going to instruct you that these techniques are simply not your concern. Your concern, your job is to weigh the evidence that's been presented and see if it proves Radio's guilt beyond a reasonable doubt.

JA 595.

> During the defense closing, Salam's counsel stated:
>
> "And I think counsel has just said it's not your concern that we don't have any forensic evidence here, it's not your concern. I disagree with that."

JA 597. In rebuttal, government's counsel stated:

He seems to have a problem with the instructions the Court is going to give you.  He seems to believe that the only evidence you can believe in or trust or use is forensic evidence . . . .

JA  623.

Salam's use of the "not your concern" phrase refers directly to the language of the investigative techniques jury instruction, coupled with a statement that counsel disagrees.  No other jury instruction used the specific words "not your concern," so the reference was obvious.

The United States responded appropriately, saying "he seems to have a problem with the instructions the Court is going to give you."  JA 623.  This referred back to the comment made by Salam's counsel about the jury instruction: "I disagree with that."   Where counsel overtly disagrees with a jury instruction, it is fair to describe him as "having a problem" with the jury instruction.  It is appropriate to clarify that a jury instruction contained the "not your concern" language, not some mere assertion by counsel for the government.  It is fair to clarify what the instruction did and did not direct.  After the challenged comment, counsel for the United States went on to repeat and discuss that specific jury instruction at length, showing what the disagreement was about, and what the law and facts actually were.  JA 623-25.

Further, Salam's counsel misstated the government's remarks. The government stated that the *court's instruction* would tell the jury that *investigative techniques* were not their concern. The government never said that it was not the jury's concern that there was no forensic evidence. The government also presented substantial argument in defense of the lack of forensic evidence regarding phone records, making it clear that the government understood that such a matter was precisely within the realm of the jury's consideration. JA 595. This is not how Salam characterized things. JA at 597.

Even if the government's comment about "having a problem with the instructions" was somehow improper, it was directly invited. Counsel's "disagreement" with the jury instruction, and his misstatement of the government's remarks, demanded a response. Salam's counsel did not object to this part of the rebuttal, so plain error review is appropriate.

Salam asserts that the government improperly argued when it asked the jury "Why would [defense counsel] want you not to consider the testimony of the eyewitnesses? Could it be that he has no explanation why all their testimony fits together so nicely?" JA 623-24. Salam raised this issue below, and the district court concluded that the argument was not improper. JA 732-33. The court stated, "[t]aken in context, the prosecutor's argument was that the defense had focused - -

in closing and throughout the trial - -on the character and credibility of the witnesses, but not on their testimony itself.  The challenged comments simply suggested that the defense's reason for ignoring the actual testimony was that it 'fit together nicely' and there could be no other explanation other than that the testimony was truthful."  JA 733.   It was entirely proper for the government's comments to be analyzed in the context in which they were made, and thus, for the reasons set forth in the district court's opinion, the government's argument was a proper response to the defense case, including its closing arguments.  *See Young*, 470 U.S. at 12-13.

Finally, Salam argues that the government's argument here was improper:

How many times did Mr. Beers jump up and say "Hearsay, confrontation?"  If the case agent had been put on to testify about what somebody else said, Mr. Beers would have had apoplexy, jumping up yelling about hearsay and confrontation.  I know it, you know it.  So it's kind of funny for him now to say, "Well, they should have done that thing that I would have objected to all day long."

JA 628.

Counsel contemporaneously objected.  *Id.*  The district court, having had the chance to observe the entire proceeding, summarily overruled this objection.  *Id.* The court later concluded that the "statement was made in direct response to defense counsel's closing argument, during which he argued that the jury never got to hear about how certain evidence was handled or why certain investigative steps

were not taken because the case agent- who exercised control over much of the physical evidence and the investigation – did not testify."  JA 733.

As the court concluded, the government's argument was in response to Salam's argument that the government should have called its case agent to testify about certain matters.  JA 628, 733.  Specifically, in closing, Salam's counsel argued that the government failed to call an agent to confirm certain testimony by Jonathan Seale.  JA 609.  Counsel stated, "there's no concrete evidence, there's no verification, and there's no explanation from the case agent, because they decided he shouldn't testify  - - he's the case agent - - he shouldn't testify, explain why - - what they did or didn't do with those phones, what they did or didn't do otherwise."  JA 609.  Counsel also argued that the government failed to call a case agent to explain Michael Payne's earlier statements.  In that regard, counsel argued:

> What's the first story?  What did he tell the case agent the first time? What's the first story?  We just got the second story.  But they didn't call the case agent to explain the first story.  We just know it's the second story.
>
>  . . .and
>
> What's the first story?  We never got that.  What did he tell the ATF agents when they sat down with him the first time.  We didn't get that. He didn't testify, that case agent."  JA 619-20.

Salam's counsel thus asserted in his closing that the government should have called a case agent to testify as to what a witness (Payne) had said. In response to defense counsel criticizing the government for not presenting what would surely have been objectionable hearsay, the government made the complained-of remarks. It would indeed have been hearsay, without exception, for the government to have attempted to introduce Payne's testimony through the case agent. Counsel, then, is arguing that the government is at fault for failing to introduce objectionable and improper testimony.[9]

Counsel had been aggressive in objecting to potential hearsay. JA 251-52, 297, 338, 347, 357, 371, 410, 443, 449, 539, 543, and 545. There were similar efforts to object on grounds of the confrontation clause. JA 251-52, 338, and 351. The dry words of the trial transcript do not accurately capture the vigor of these objections, although the district court at one point described counsel as "enthusiastic." JA 376.

---

[9] In his brief, counsel depicts the government's comments as being somehow related to the ATF agent not testifying about the contents of various cell phones. Br. of Appellant at 32-34. However, testimony of a case agent as to phone contents would not be hearsay, and so the government's response in rebuttal would have been nonsensical if this were its basis. Rather, the government was responding to counsel's comments made on JA 619-20, which clearly demand the admission of hearsay through the case agent, and castigate the government for not doing this.

Given this past behavior, it was remarkable for counsel to argue that the government was at fault for not offering hearsay. Counsel challenged the government for not doing something that was in fact objectionable, and to which counsel had routinely and vigorously objected. An inconsistency and unfairness of this sort invited response.[10]

Post trial, Salam objected a third time to the government's comments, seeking a mistrial or a new trial. JA 727. The district court, by written opinion, denied Salam's motion, finding that the comments were in direct response to counsel's closing arguments, that they were not improper, and that even had the comments been improper, they would not have prejudicially affected the defendant's substantial rights so as to deprive him of a fair trial. JA 733-34. The court concluded that "[t]his statement was made in direct response to defense counsel's closing argument during which he argued that the jury never got to hear about how certain evidence was handled or why certain investigative steps were not taken because the case agent – who exercised control over much of the physical evidence and the investigation – did not testify." *Id*. at 733.

---

[10] The government could also justifiably have argued that if Salam wanted these witnesses called, he could have called them himself. *See*: *United States v. Molovinsky*, 688 F.2d 243 (4th Cir. 1982 ) *cited in United States v. Walker*, 191 F. App'x 205 (4th Cir. 2006).

Ultimately, the government's responses were brief, limited in scope, and responded precisely to counsel's closing. The comments were not misleading, nor could they have inflamed the jury's passions. Even setting aside the challenged comments, there was more than sufficient evidence from which the jury could find Salam's guilt. The challenged comments righted the proverbial scales, nothing more. As such, they were not improper. They did not prevent Salam from obtaining a fair trial.

## VI. THE DISTRICT COURT PROPERLY APPLIED A FOUR-LEVEL SENTENCING ENHANCEMENT UNDER U.S.S.G. § 3B1.1(a) BECAUSE SUFFICIENT EVIDENCE ESTABLISHED THAT SALAM ORGANIZED AND LED THE HEROIN DISTRIBUTION CONSPIRACY.

Standard of Review

This Court reviews for clear error a district court's decision to impose a sentencing enhancement based on role in the offense. *United States v. Sayles*, 296 F.3d 219, 224 (4th Cir. 2002).

Discussion

Section 3B1.1(a) of the United States Sentencing Guidelines provides that if "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," then the sentencing court should

impose a four-level increase. U.S. Sentencing Guidelines § 3B1.1(a) (2014).[11]

Salam does not challenge that his conspiracy involved five or more people—the

sole dispute is whether his role in the conspiracy qualifies him as an organizer or

leader.[12] Br. of Appellant at 41–44.

The Guidelines provide several factors to consider when deciding whether a

defendant is an organizer or leader, as opposed to a manager or supervisor: the

"exercise of decision making authority;" the nature of the defendant's participation

in the offense; whether the defendant recruited accomplices; whether the defendant

claimed a "larger share of the fruits of the crime;" the "degree of participation in

planning or organizing the offense;" the extensiveness of the illegal activity; and

the "degree of control and authority exercised over others." U.S.S.G. § 3B1.1.

cmt. n. 4 (2014); *see also Sayles,* 296 F.3d at 224 (discussing these seven

Guidelines factors).

The record must provide sufficient evidence to support the enhancement by

showing that the defendant did in fact exercise the requisite level of control, but the

---

[11] Section 3B1.1(b) provides for a three-level enhancement for defendants that are
managers or supervisors (but not organizers or leaders) of a conspiracy of five or
more people. Section 3B1.1(c) provides for a two-level adjustment where the
defendant is an organizer, leader, manager, or supervisor "in any criminal activity
other than described in (a) or (b)."

[12] Salam does argue that the government did not prove that he exercised control
over five or more subordinates, but the government is not required to prove control
over five subordinates. Br. of Appellant at 43; U.S.S.G. § 3B1.1(a).

sentencing court need only describe those factors that are relevant to the case. *United States v. Slade*, 631 F.3d 185, 190–91 (4th Cir. 2011); *Sayles*, 296 F.3d at 224–25; *United States v. Harris*, 39 F.3d 1262, 1270–71 (4th Cir. 1994).  Courts can consider a wide range of evidence in deciding the proper sentence, as long as the evidence is reliable.  *See* 18 U.S.C. § 3661 (2012).

The Fourth Circuit has laid down several rules for assessing whether a § 3B1.1 enhancement is proper.  The defendant must *actually* exercise control over a criminal operation—simply being in the position to *potentially* exercise control is not enough.  *United States v. Cameron*, 573 F.3d 179, 185 (4th Cir. 2009).  Besides exercising actual control, the defendant must organize or lead people, as opposed to controlling the proceeds of the crime.  *Id.*  Critically, the Fourth Circuit has repeatedly held that exercising control over a *single* person in the conspiracy is sufficient to qualify for a role enhancement.  *United States v. Steffen*, 741 F.3d 411, 416 (4th Cir. 2013); *United States v. Bartley*, 230 F.3d 667, 673 (4th Cir. 2000).

*Sayles* and *Slade* are examples of where this Court found the record was insufficient to show that a defendant exercised the required level of control over another person or persons; so no enhancement was warranted.  In *Sayles*, the district court relied on the presentence report's findings to impose a four-level increase on the defendant.  *Sayles*, 296 F.3d at 222, 224.  The Court found that the

report's bare assertion of an aggravated role did not constitute sufficient evidence, as there was no indication that the defendant did anything beyond buying and selling drugs. *Id.* at 225.

In *Slade*, the defendant was a "mid-level drug trafficker" who pled guilty to a count of conspiracy after he was arrested for supplying large quantities of crack cocaine, cocaine, and marijuana to six co-conspirators (who then distributed the drugs). *Slade*, 631 F.3d at 187. This Court struck down the imposition of a three-level role enhancement because the only factual findings supporting the adjustment were that the defendant sold or delivered drugs to his own clients and other co-conspirators (who then sold the drugs), and that one co-conspirator drove the defendant to various places to deliver drugs. *Id.* at 190. The Court found that there was no evidence that the defendant "exercised any supervisory responsibility over these persons by controlling them or directing the terms of their sales," and that there was no evidence that the co-conspirator drove the defendant "pursuant to or as a result of any exercise of managerial or supervisory authority" by the defendant. *Id.* at 191. Without evidence of supervision or management, the three-level enhancement could not be applied to the defendant. *Id.*

In contrast to *Slade* and *Sayles*, if the record does provide evidence of organization or leadership——then this Court has upheld leadership

enhancements.  In *United States v. Jones*, 356 F.3d 529 (4th Cir. 2004), the defendant was convicted of possession with intent to distribute fifty grams or more of crack cocaine.  *Id.* at 532.  This Court upheld a four-level enhancement where trial testimony established that the defendant "maintained contact with drug suppliers," "recruited people to work as dealers," controlled the allocation of drugs to his dealers (for example, by giving dealers specific sales goals and setting the prices for the drugs they sold), and decided how to divide the profits.  *Id.* at 538.

The Court has also considered whether a defendant played a critical role in the conspiracy because he was essential to its operation.  For example, in *United States v. Villareal–Marrero*, 574 F. App'x 254, 254–55 (4th Cir. 2014) (unpublished), the Court noted how the district court concluded that, among other factors, the "distribution of cocaine would not have occurred without [the defendant] because he was in direct contact with the supplier."

Evidence that the defendant "fronted" drugs (provided them on consignment) to other members is relevant in deciding whether an adjustment is appropriate.  *See, e.g.*, *United States v. Gibbs*, 547 F. App'x 174, 184 (4th Cir. 2013)(unpublished).  Fronting drugs is relevant for a sentence enhancement because it is evidence that a defendant is "controlling the drug buys of other conspirators."  *United States v. Kellam*, 568 F.3d 125, 148 (4th Cir. 2009).

Finally, this Court has held that evidence of only one factor under the Guidelines can support the imposition of a four-level enhancement. *Harris*, 39 F.3d at 1270. In *Harris*, the district court "heard argument on [the defendant's] involvement in the conspiracy, and his control over others," found that the aggravating role was "supported by overwhelming evidence," and "justified the enhancement because [the defendant] recruited other people into the conspiracy." *Id*. This Court stated that it was not clear error for the district court to find that the defendant's role in the offense warranted an enhancement, "even though it did not distinctly articulate any factors in addition to [the defendant's] recruitment activities." *Id.* at 1270–71.

Salam argues that this case is indistinguishable from *Slade*, in that Salam supplied drugs to his co-conspirators, but did not control any of their activities. Br. of Appellant at 43. The evidence shows, however, that Salam controlled Chris Carter by using him as a drug courier. Trina Richardson testified that Carter would drive with her to places like Crown Chicken after Carter received a phone call, saying that he "had to go do something for 'Little Shorty.'" JA 344. Carter would either use the word "brick" or say that he had to drop off a package for Radio. JA 342.

Jonathan Seale's testimony confirms that Carter went to Crown Chicken to drop off heroin for Salam—Seale testified that he would order heroin from Salam and then Carter would show up with the drugs. JA 260–61. Exercising control over even one person is sufficient for a four-level enhancement, *Steffen*, 741 F.3d at 416. Salam's use of Carter as a drug courier distinguishes this case from *Slade*; the record in *Slade* provided no evidence that the defendant directed couriers. *Slade*, 631 F.3d at 191.

Multiple witnesses also testified that Salam fronted drugs, another factor in assessing the appropriateness of an enhancement. Seale reported that, "for the most part," he would obtain heroin on credit and then pay for it later. JA 268. Antonne Day and Michael Payne also testified that Salam fronted them heroin. JA 411, 529.

There was also evidence that Salam recruited Payne as an accomplice. Payne testified how he saw Salam one day and told Salam that he needed a way to make money because he had lost his job. JA 525. Salam told Payne that he had some "work" available, which meant drugs. JA 526. Salam then provided Payne heroin on credit, which Payne then sold. JA 527–29. Once Payne paid Salam for the drugs, Salam continued to provide him with heroin for resale. JA 531. Payne's testimony shows how Salam recruited Payne into the conspiracy to sell heroin.

The evidence supports the district court's imposition of a four-level enhancement. The sentencing judge was correct in stating there was "no doubt" in his mind that "the government adduced evidence that [the defendant was] managing or controlling other people during the operation of this conspiracy." JA 775. Salam's attempt to equate the bare-bones record in *Slade* with the extensive record here is inaccurate. The evidence shows that Salam controlled a courier, fronted drugs, and recruited an accomplice; all are evidence of a leadership role. The district court properly applied the four-level enhancement.

## CONCLUSION

For the above reasons, the United States respectfully requests that this Court

affirm Salam's conviction, as well as the sentence imposed by the district court.

Respectfully submitted,

ANTHONY P. GIORNO
Acting United States Attorney

/s/ R. Andrew Bassford
Assistant United States Attorney
Virginia State Bar #42584

/s/ Daniel P. Bubar
Assistant United States Attorney
Illinois State Bar #6282587

United States Attorney's Office
P.O. Box 1709
Roanoke, VA 24008-1709
Telephone: (540) 857-2250
Facsimile: (540) 857-2614
Email: andrew.bassford@usdoj.gov

## STATEMENT CONCERNING ORAL ARGUMENT

The United States believes that the facts and legal arguments related to the issues before the Court have been adequately presented in the briefs and the record, and that the decisional process would not be significantly aided by oral arguments. However, counsel for the United States will be available to present oral argument if the Court so directs.

/s/ R. Andrew Bassford
Assistant United States Attorney

## CERTIFICATE OF COMPLIANCE

This brief has been prepared using fourteen point, proportionally spaced, serif typeface – Microsoft Office Word 2007, Times New Roman, 14 point, and is in compliance with Fed. R. App. P. 32(a)(7)(B).

This brief contains 63 pages and approximately 13,959 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(ii), and is in compliance with Fed. R. App. P. 32(a)(7)(B).

I understand that a material misrepresentation can result in the Court striking the brief and imposing sanctions.

/s/ R. Andrew Bassford
Assistant United States Attorney

**CERTIFICATE OF FILING AND SERVICE**

I certify that on January 14, 2015, I electronically filed the foregoing

Response Brief of Appellee with the Clerk of the Court using the CM/ECF System,

which will send notice, and constitute service, of such filing to the following

registered CM/ECF user(s):  Paul G. Beers, Esq., Counsel for Salam.


         /s/ R. Andrew Bassford

         Assistant United States Attorney